**JOHNSON PRODUCTS COMPANY,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 76–1424.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1977.
Decided Feb. 16, 1977.

George M. Burditt, Chicago, Ill., for petitioner.

Gerald P. Norton, Mark W. Haase, F. T. C., Washington, D. C., for respondent.

Before PELL and SPRECHER, Circuit Judges, and EAST, Senior District Judge.*

---

* Senior District Judge William G. East of the District of Oregon is sitting by designation.

1. 16 C.F.R. § 2.34 states:

Upon receiving an executed agreement conforming with the requirements of § 2.32, the Commission may: (1) Accept it; (2) reject it and issue its complaint; or (3) take such other action as it may deem appropriate. If an agreement is accepted, the Commission will place the order contained therein and any initial report of compliance submitted pursuant to § 2.33 on the public record, and at the same time, will make available an explanation of the provisions of the order and the relief to be obtained thereby and any other information which it deems helpful in assisting interested persons to understand the terms of the order. The Com-

SPRECHER, Circuit Judge.

Johnson Products Company [hereinafter referred to as "Johnson"] petitions this court to review and set aside a "consent" cease and desist order entered against it by the Federal Trade Commission [hereinafter referred to as the "FTC" or the "Commission"] on February 10, 1976, FTC Docket No. C–2788.

I

On June 9, 1975, Johnson executed an agreement containing a consent cease and desist order, which was negotiated under the FTC consent order procedures. 16 C.F.R. §§ 2.31–2.35. The order prohibited Johnson from making certain representations regarding its cosmetic products and required Johnson to make warnings in connection with its hair relaxer products.

On November 19, 1975, the Commission accepted the executed agreement, and it was placed on the public record for sixty days in order to permit interested persons to file comments with the Commission regarding the proposed Johnson order. After the public comment period, the Commission was to have thirty days in which to consider the comments and make a final decision on whether to withdraw its prior acceptance of the agreement or to enter the order contained in the agreement. This process is required by the Commission's rules and the parties' agreement. See 16 C.F.R. § 2.34; Agreement Containing Consent Order to Cease and Desist, Paragraph D.[1]

mission will publish the agreement, order and explanation in the Federal Register. For a period of sixty (60) days after placement of the order on the public record and issuance of the statement, the Commission will receive and consider any comments or views concerning the order that may be filed by any interested persons. Thereafter, within thirty (30) days, the Commission may either withdraw its acceptance of the agreement and so notify the other party, in which event it will take such other action as it may consider appropriate, or issue and serve its complaint (in such form as the circumstances may require), and decision, in disposition of the proceeding.

Paragraph D of the agreement provides:

In a letter dated January 19, 1976—the last day of the public comment period, but prior to any final decision by the Commission—Johnson notified the Commission that it was withdrawing its consent to the agreement because of the "unexpected delay in reaching similar agreements with the balance of the industry, and . . . the documentable threat of unfair competition resulting therefrom."

In a letter dated February 11, 1976, the Commission advised Johnson that it refused to allow the withdrawal of consent and that it had entered the cease and desist order on February 10, 1976. On March 22, 1976, Johnson filed a Petition for Reconsideration, which was denied on May 7, 1976.

The matter is now properly before us on a petition filed by Johnson to review and set aside the order entered by the Commission. 15 U.S.C. § 45(c); *Federal Trade Commission v. Consolidated Foods Corp.*, 396 F.Supp. 1344, 1349–50 (S.D.N.Y.1974).

## II

The first issue raised by Johnson is whether it had the right to *unilaterally* withdraw its consent to the agreement containing the cease and desist order.

Johnson's argument may be briefly summarized. The FTC consent order procedures are subject to common law contract principles. FTC Rule 2.34, 16 C.F.R. § 2.34, gives the Commission thirty days after the public comment period in which to make a final decision on whether to withdraw its acceptance of the agreement or to enter the consent order. Since the Commission can withdraw its acceptance, two contract principles permit consent order respondents to withdraw their consent so long as the withdrawal occurs prior to a final decision by the Commission: (1) since the Commission never made an *unconditional* acceptance,

respondents may withdraw their offers of consent; and (2) since there exists no *mutuality of obligation* before a final Commission decision, there is no enforceable contract. And, since Johnson in fact withdrew its consent prior to the Commission's decision to enter the order, the issuance of the order over Johnson's objections was error and violative of due process.

We begin our inquiry by examining the premise upon which Johnson's entire argument is constructed—namely, that the law of contract governs the question of whether a consent order respondent may unilaterally withdraw its consent prior to a final determination by the Commission to enter the agreed upon order. In *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) and *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), the Supreme Court indicated that in determining the scope of a consent decree—what is prohibited or required by the terms of the decree—rules of contract construction should be employed. However, in *ITT Continental Baking Co.*, the Court specifically noted that

> [c]onsent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court or administrative agency. . . . Because of this dual character, consent decrees are treated as contracts for some purposes but not for others.

*Id.* at 236–37, 95 S.Ct. at 934, n. 10 (citations omitted).

Thus, whether a consent decree will be treated as a contract will depend upon the

---

This agreement shall not become a part of the official record of the proceedings unless and until it is accepted by the Commission. If this agreement is accepted by the Commission it, together with the draft of complaint contemplated thereby, will be placed on the public record for a period of sixty (60) days and information in respect thereto publicly

released; and such acceptance may be withdrawn by the Commission if, within thirty (30) days after the sixty (60) day period, comments or views submitted to the Commission disclose facts or considerations which indicate that the order contained in the agreement is inappropriate, improper, or inadequate.

particular context in which the issue arises. In *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), for example, the Court summarily rejected the contention that a consent decree should be considered a contract for purposes of determining whether the courts have the power to modify such a decree absent the parties' consent. And, in *Control Data Corp. v. International Business Machines Corp.,* 306 F.Supp. 839 (D.Minn.1969), *aff'd,* 430 F.2d 1277 (8th Cir. 1970), the court rejected the argument that a consent decree should be treated as a contract for purposes of determining whether a third party beneficiary action could be maintained for breach of that contract.

As Professor Handler has pointed out, treating consent decrees differently in distinct contexts is not inconsistent:

> The only issue before the Court in *Armour* was the "narrow question" of the proper construction of the . . . Decree. *Armour* is in total harmony with the time-honored view that consent decrees are to be treated as contracts for purposes of construction. When Justice Cardozo characterized such a decree in *Swift* as a judicial act, it was with reference to an equally time-honored principle that an injunction is always subject to adaptation on a showing of changed circumstances. Hence, *Armour* and *Swift* merely reflect the fact that "it is possible for a court to treat a stipulated judgment as a contract for one purpose but not for another"—a recognition that avoids the pitfalls of "lump concept" thinking.[2]

■ With these principles in mind, we think that the FTC consent order process should not be treated as a mere codification of the contract law of offer and acceptance for purposes of determining whether a respondent may unilaterally withdraw its consent prior to final agency action.[3] Moreover, "for reasons of . . . policy inapplicable to the usual contract,"[4] we find that respondents have no right to withdraw unilaterally from an FTC consent agreement.

The FTC rules authorize the Commission to accept an agreement containing a cease and desist order which has been executed by the respondent. 16 C.F.R. § 2.34. However, the rules expressly reserve to the Commission the right to withdraw its acceptance of the agreement after it has had an opportunity to consider the views filed by interested persons during the public comment period. 16 C.F.R. §§ 2.32, 2.34. The Commission is given thirty days in which to make its decision on whether to withdraw its acceptance. 16 C.F.R. § 2.34. The Commission interprets its rules, however, to preclude respondents who have executed consent agreements from unilateral withdrawal prior to the time designated for final agency action.

■ We are cognizant of the fact that a reasonable interpretation by the Commission of its own regulations is entitled to great deference by this court, *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and we find persuasive several policy considerations supportive of the Commission's position.

■ The Commission, unlike a private litigant, must act in furtherance of the public interest. *Federal Trade Commission v. Cinderella Career and Finishing Schools, Inc.,* 131 U.S.App.D.C. 331, 404 F.2d 1308, 1313–14 (1968). When the Commission's consent, rather than adjudicatory, procedures are followed, there is no public hear-

---

2. Handler, *Twenty-Fourth Annual Antitrust Review,* 72 Colum.L.Rev. 1, 28 (1972). *See also* Sullivan, *Enforcement of Government Antitrust Decrees by Private Parties: Third Party Beneficiary Rights and Intervenor Status,* 123 U.Pa.L. Rev. 822, 847 (1975) [hereinafter cited as *Sullivan*]. Although Professor Sullivan disagrees with the particular result reached in *Control Data Corp., supra,* he does not reject the view expressed in the text that consent decrees may

be treated as contracts for some purposes and not for others.

3. In view of this conclusion, it is unnecessary to decide whether, if treated as an ordinary civil contract, the agreement containing the consent order was enforceable at the time of Johnson's purported withdrawal.

4. *Sullivan, supra* note 2, at 847.

ing on the record, the negotiations culminating in the consent agreement are generally not a matter of public record, and there is no opportunity for interested persons to intervene and participate in the process. *See generally* 16 C.F.R. §§ 2.31–2.35. Where the terms of an order have been arrived at in such secret negotiations and the basis for agreement on those terms is not subject to public scrutiny, it was not unreasonable for the Commission to conclude that the public interest could not be adequately protected by mere agreement of the parties.[5]

■ Hence we cannot say it was unreasonable for the Commission, in order to safeguard against the risks inherent in the consent order process, to reserve to itself the right to withdraw its acceptance after the public comment period. The Commission's rules simply "provide a final review of the proposed order after public scrutiny, with the Commission having the final right in the public interest to escape from the consequences of the provisional consent if public comment provides objections which were not previously considered." *Ford Motor Co. v. Federal Trade Commission*, 1976–1 Trade Cas. ¶ 60,938 at 69,114 (6th Cir. 1976), *modified on other grounds, Ford Motor Co. v. Federal Trade Commission*, 547 F.2d 954 (6th Cir. 1976).

Moreover, as did the Sixth Circuit in *Ford Motor Co.* we find ample justification for the Commission's refusal to extend a similar right of unilateral withdrawal to respondents. The availability of the consent order process, as an alternative to adjudication, benefits both the Commission and respondents in that it allows them to "save . . . time, expense, and inevitable risk of litigation." *Armour, supra,* 402 U.S. at 681, 91 S.Ct. at 1757. The Commission "is able to stop a greater number of violations of the . . . [Federal Trade Commission Act]

significantly more quickly, while being relieved of the uncertainties and resource absorption of litigation."[6] Thus, the consent procedures, by avoiding protracted litigation in a significant number of cases, enable the Commission to more efficiently allocate its limited resources in order to maximize the protection of the public from "unfair or deceptive acts or practices." Respondents are benefited in that "consent decrees offer minimal unfavorable publicity [especially in view of the fact that frequently there is no admission that the law has been violated], considerably lower expense, and lesser disruption of the defendant's ordinary business affairs."[7] The respondent may also be able, through the negotiation process, to obtain a decree or order more favorable than one which might have resulted if the respondent had insisted on adjudicating the charges brought by the Commission.

It certainly was not unreasonable for the Commission to conclude that permitting respondents to withdraw unilaterally from the consent agreements which they have executed and presented to the Commission for acceptance may pose a serious risk of undermining the continued efficacy of the consent order process as an alternative to lengthy adjudication. As the Commission noted in its brief to this court:

> [R]espondents might be encouraged to use the Commission's consent procedures as a dilatory tactic, for if a company were not bound at the outset of the 60-day comment period, it might be tempted to "agree" to an order, only to "withdraw" its agreement at the last moment in order to proposed a new, slightly revised version. This tactic might be employed again after the Commission had accepted the revised version. In the meantime, the Commission, in reliance upon the respondent's action in signing the agree-

5. *See generally* Note, *The ITT Dividend: Reform of Department of Justice Consent Decree Procedures,* 73 Colum.L.Rev. 594 (1973) [hereinafter cited as *Columbia Note*]. Most of the legal commentary in this area deals with the consent procedures of the Justice Department. However, the procedures of the FTC and Jus-

tice Department are similar in those aspects pertinent to the issues raised in this appeal.

6. *See Columbia Note,* note 5 *supra,* at 596 (footnote omitted).

7. *Id.* at 596 (footnote omitted).

ment, foregoes the opportunity of instituting formal proceedings.

Commission Brief at 13.

In other words, if unilateral withdrawal by respondents were permitted, it might "provide another delaying tactic for the recalcitrant offender whose design is to prolong as much as possible the period during which he can continue the use of his advertisement." [8] Moreover, even if the withdrawal were not motivated simply by the desire to delay enforcement of the Act's proscriptions but rather reflected a genuine change in the respondent's judgment as to the relative benefits and costs of the consent and adjudicatory processes, the detrimental impact on the viability of the consent process may be no less serious. If the Commission faces the prospect of negotiation, agreement, withdrawal and then protracted adjudication—the very result the consent procedures were designed to avoid—it may decide that efficient allocation of agency resources dictates a policy of adjudication at the outset. The aforementioned benefits to the public and many respondents from the availability of consent procedures may then be lost.

■ Finally, we note that the "time limitations are reasonable ones. The party proposing the consent order is not left unilaterally committed for an indefinite period." *Ford Motor Co., supra,* at 69,114.

■ Accordingly, we hold "that the Commission's interpretation of its rules as prohibiting . . . [Johnson] from *unilateral* withdrawal of . . . [its proposed consent order] is consistent with the language of the rule, does not offend due process, and should be accepted by this court." *Ford Motor Co., supra,* at 69,114 (emphasis added).[9]

## III

Johnson next contends that, even if it had no right to withdraw *unilaterally* from the consent agreement, *under the total circumstances of this case* the Commission's refusal to allow withdrawal or to at least hold a hearing on the question constituted an abuse of discretion.

The alleged "circumstances" upon which Johnson relies may be briefly summarized. Johnson contends that it competes with Revlon, Inc. and its subsidiaries in the relevant hair relaxer markets. During the course of the consent order negotiations, Johnson advised the Commission that if similar restrictions were not imposed on other major competitors, especially Revlon, Johnson would suffer competitive disadvantage. Johnson further claims that when it executed the consent agreement, it did so in reliance on the assurances of FTC representatives that the entire industry, including Revlon, would be subject to equally restrictive orders.

However, when no action had been taken against Revlon by the last day of the public comment period on the *Johnson* order, Johnson claims that it was required to withdraw from the consent agreement because of the risk of unfair competitive disadvantage. Moreover, the consent order which the Commission finally entered against Revlon was less restrictive in its terms than the *Johnson* order. The disparities, Johnson contends, reflect an unfair and arbitrary discrimination between similarly situated competitors. The disparity on which Johnson placed principal reliance is in the area of product coverage: the *Johnson* order prohibits certain representations in connection with *any cosmetics,* while the proscriptions in the *Revlon* order are limited to *hair care products.*[10]

8. Note, *Developments in the Law—Deceptive Advertising,* 80 Harv.L.Rev. 1005, 1073 (1967).

9. Our holding is limited to the question of whether a respondent may *unilaterally* withdraw its consent from an FTC consent agreement. For the reasons stated in Part III of this opinion, we expressly reserve the question of whether *under certain circumstances* a Commission refusal to either withdraw its own acceptance or to allow a respondent to withdraw its consent would constitute an abuse of discretion or a violation of due process.

10. Johnson also asserts a substantial competitive injury from the delay in entering an order against Revlon, since Johnson was required to comply with advertising restrictions while a

The Commission's explanation of the disparate treatment of Johnson and Revlon appears in a letter to Johnson's counsel dated January 3, 1977.[11] The Commission asserts that, in several respects, the two companies were not similarly situated: (1) there existed differences in "the nature of the practices which constituted the violation, the nature and extent of the harm caused by the practices, and the feasibility of complying with the reporting requirements of the order"; (2) hair straighteners accounted for a lower percentage of Revlon's sales than was the case with Johnson; and (3) Revlon does not compete with Johnson in the consumer market, in which hair straighteners may have their most injurious impact. Johnson, however, challenges each of the Commission's claims, except the assertion as to percentage sales which Johnson contends is irrelevant.

▆ The Commission correctly asserts that, without simultaneously proceeding against all firms in an industry, the Commission has the discretionary power "to enter an order against one firm that is practicing an industry-wide illegal trade practice." *L. G. Balfour Co. v. Federal Trade Commission*, 442 F.2d 1, 24 (7th Cir. 1971) (citations omitted). *See also Moog Industries, Inc. v. Federal Trade Commission*, 355 U.S. 411, 413–14, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); *United Biscuit Company of America v. Federal Trade Commission*, 350 F.2d 615 (7th Cir. 1965). It is also within the Commission's remedial power to fashion an all-products order, such as the *Johnson* order, even though the violations charged in the complaint relate to less than all the respondents' products. *Id.* at 623.

There are, however, limits on the Commission's discretionary enforcement authority.[12] As this court stated in *L. G. Balfour Co.*:

> [T]he Commission's orders are to serve a remedial and not a punitive function, . . . and the Commission may not issue orders which would arbitrarily destroy one of many violators in the market. . . . It is the responsibility of the Commission to perform a "reasonable evaluation" of the competitive situation to ascertain whether a particular order would be contrary to the purpose of the laws sought to be enforced.

*Id.* at 24 (citations omitted). *See also Federal Trade Commission v. Universal-Rundle Corp.*, 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); *Moog Industries, supra.* Thus, the Commission's "discretionary determination . . . [may] be overturned . . . [for] a patent abuse of discretion." *Moog Industries, supra*, 355 U.S. at 414, 78 S.Ct. at 380.

However, we find it impossible on the record before us [13] to determine whether it constituted a patent abuse of discretion for the Commission to refuse to permit Johnson to withdraw from the consent agreement in the face of Johnson's claim that the Commission's regulatory policy had arbitrarily placed Johnson at an unfair competitive

---

major competitor, Revlon, was able to do business free of such restrictions.

**11.** The Commission's response to Johnson's claim of competitive injury from the delay in entering the *Revlon* order (*see* note 10, *supra*) is that "the alleged competitive harm . . . will not be removed by rejecting the *Revlon* consent order and issuing a complaint. Litigation of the complaint will be prolonged, and there is no assurance that the relief ultimately imposed will be identical with that required in the *Johnson* order."

**12.** In addition to the limits on an arbitrary regulatory policy articulated in the text, due process problems may arise under certain circumstances where a consent order is entered over the objections of one of the parties. *Cf. United States v. Ward Baking Co.*, 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1964); *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

**13.** When an order issues after adjudication, there is a hearing on the record and findings, and the reviewing court can determine whether the agency's regulatory policy evidences a patent abuse of discretion. Since both the *Johnson* and *Revlon* orders are consent orders, the terms were formulated in secret negotiations and there is no record evidence of the basis for the precise terms of the subsequently issued orders.

disadvantage vis-à-vis other competitors in the industry. The only facts of record are: (1) that Johnson advised the Commission of Johnson's concern that competitive disadvantage would result if equally restrictive orders were not imposed on all major competitors, and (2) that the order subsequently entered against Revlon was in several respects—the most important being product coverage—less restrictive than the *Johnson* order.

There is no support in the record for Johnson's claims that FTC representatives made assurances that equally restrictive orders (*e. g.* all-products orders) would be imposed on all major competitors including Revlon, that the disparate treatment of Johnson and Revlon was arbitrary, and that the disparate treatment would result in serious competitive injury to Johnson. Similarly, there is no support in the record for the Commission's assertion that the disparities between the *Johnson* and *Revlon* orders are justified by the "fact" that, in several pertinent respects, the two companies are not similarly situated.

Accordingly, the inadequacy of the record at this stage of the proceedings precludes us from reaching the question of whether the *Johnson* order, under all the circumstances, should be set aside as an abuse of discretion.

The remaining issue, therefore, is whether Johnson was entitled to a hearing with findings on its claim that, under the circumstances, it should have been allowed to withdraw from the consent order agreement. However, three days prior to the oral argument in this cause, the Commission "extended to Johnson an invitation to apply for reopening of its consent order. The Commission may determine during the course of such a proceeding that the public interest requires modification of the *Johnson* order to eliminate some or all of the disparities you describe."

If during the course of the reopening proceeding the *Johnson* order is in fact modified to eliminate the critical disparities between the *Johnson* and *Revlon* orders, the circumstances which Johnson contends permit it to withdraw from the consent agreement will likewise have been eliminated. Since we held in Part I of this opinion that Johnson had no *unilateral* right to withdraw from the consent order, there would remain no issues for this court to decide.

In these circumstances, we are of the opinion that, before deciding what may prove to be an important and difficult question of administrative law, the Commission should first be afforded the opportunity to reexamine the challenged disparities between the *Johnson* and *Revlon* orders.

Accordingly, we retain jurisdiction over the cause, stay enforcement of the order, and remand to the Commission for further proceedings consistent with this opinion.

Remanded.