**ENCYCLOPAEDIA BRITANNICA, INC., and Britannica Home Library Services, Inc., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 76–1477.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1977.

Decided Aug. 2, 1979.

Bryson P. Burnham, Mayer, Brown & Platt, Chicago, Ill., for petitioners.

D. Barry Morris, F. T. C., Washington, D.C., for respondent.

Before FAIRCHILD, Chief Judge, and SPRECHER and WOOD, Circuit Judges.

FAIRCHILD, Chief Judge.

This is a petition to review an order of the Federal Trade Commission holding that certain practices of petitioners, Encyclopaedia Britannica, Inc. and its subsidiary, Bri-

tannica Home Library Services, Inc. (hereinafter referred to jointly as Britannica) violated § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) [1], and ordering Britannica to cease and desist from certain practices. Some of the cease and desist provisions of the orders were so framed as to forbid certain customary sales and promotional activity unless specified notices were given. These notice provisions are the subject of this review.

## I. THE AGENCY PROCEEDING

Encyclopaedia Britannica, Inc. is a New York Corporation with its principal place of business in Chicago. As is widely known, Britannica publishes, sells, and distributes encyclopedias, textbooks, general reference works, and other educational and literary products throughout the world. The primary sales method is direct selling at the homes of customers.

The complaint which initiated the proceeding before the Commission was issued December 11, 1972. It charged deceptive practices in recruitment of sales representatives, in sales presentations to members of the public, in obtaining leads to persons who will allow Britannica sales representatives into their homes, in seeking subscriptions to book promotions, and in collection procedures. On December 16, 1974, after trial hearings, ALJ Barnes entered very extensive findings, conclusions, and a remedial order. In respects not material on this review, the ALJ found deceptive and unfair practices in recruiting advertisements, in certain sales devices, a mail order program, and the use of types of collection letters. On this review, Britannica has narrowed its challenges to remedial provisions relating to deception on initial contact of salesmen with consumers, and to deception in certain advertised offerings.

*A.* The ALJ summarized his detailed findings concerning "Initial Contact With Consumers," in part as follows:

tive acts or practices in commerce, are declared unlawful." This section has since been amended in ways not relevant to this appeal.

1. At the time this proceeding was instituted, 15 U.S.C. § 45(a)(1) provided: "Unfair methods of competition in commerce, and unfair or decep-

"The primary means by which EB [Britannica] sells its products and services is through the door-to-door solicitation of consumers. . . . EB's salesmen utilize numerous devices which disguise the purpose of the salesman's initial contact with prospects—devices which essentially are ruses for gaining admission into prospects' homes 'not in the role of a salesman' . . . .. These devices are approved by EB's management, are made available to its salesmen, and the salesmen are trained by EB to effectively use such devices.—

"One ploy used to gain entrance into prospects' homes is the Advertising Research Analysis questionnaire. This form questionnaire is designed to enable the salesman to disguise his role as a salesman and appear as a surveyor engaged in advertising research. EB fortifies the deception created by the questionnaire with a form letter from its Director of Advertising—for use with those prospects who may question the survey role. These questionnaires are thrown away by salesmen without being analyzed for any purpose whatsoever.—

"Thus, the record is clear that EB's sales representatives misrepresented and failed to disclose the purpose of the initial contact with prospects. These practices were authorized and condoned by EB. . . ."

The portions of the ALJ's order challenged by Britannica and remedying the practices above described require Britannica to cease and desist from:

"D. Visiting the home or place of business of any persons for the purpose of soliciting the sale, rental or lease of any publications, merchandise or service, unless at the time admission is sought into the home or place of business of such person, a card 3 inches by 5 inches in dimension, with all words in 10-point bold-face type, with the following information, and none other, in the indicated order, is presented to such person:

(1) the name of the corporation;

(2) the name of the salesperson;

(3) the term 'Encyclopedia Sales Representative' [or other applicable product];

(4) the terminology: 'The purpose of this representative's call is to solicit the sale of encyclopedias' [or other applicable product]; and

(5) the statement: This card should be kept as part of your permanent records of this transaction.

[Paragraph 5 was deleted from the order by the Commission.]

"E. Failing to give the card, required by Paragraph II D, above, to each such person, to direct each such person to read the information contained on such card, and to provide each such person with an adequate opportunity to read the card before engaging any such person in any sales solicitation."

In discussing the remedial order, the ALJ said he had "taken into consideration . . (1) the numerous violations of law by respondents which this record establishes, consisting of conduct which has been declared unlawful by the Commission over the years, (2) the fact that this order must be designed to protect the general consuming public which includes the ignorant, the unthinking and the credulous . . ., (3) respondents' past record of unlawful conduct as determined in previous Commission proceedings, [1952 and 1961 orders concerning representations with respect to allegedly 'special' prices and the like] and (4) the fact that '. . . once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor' . . . .."

With respect to the Initial Contact deception, the ALJ wrote as follows:

"The Order contains provisions which prohibit respondent from misrepresenting the purpose of contacting persons in their homes or places of business, and require respondent to clearly inform prospects in telephone talks and at the door that the

purpose of the visit is to solicit the sale of respondent's products or services. This will correct respondent's misrepresentations and deceptions as shown by the record. As one of EB's former corporate officials testified, the ability to gain admittance into the home is essential to respondent's business operations (Balsano, Tr. 1542). Thus, elimination of misrepresentations and deceptions in gaining admittance into homes is crucial to this Order as well. There is no conceivable business or other justification for misrepresenting the purpose of a salesman's visit. A homeowner is entitled to know the purpose behind any visit by a salesman. The time has arrived to put an end to deceptions of this type.

"For these reasons, the Order entered herewith requires EB's salesmen to present the prospect with a card which clearly discloses the purpose of the visit. Respondent strenuously objects to such an Order provision (RPF III–7; RM, p. 43; RRM, p. 17); however, no satisfactory alternatives are suggested. The use of a disclosure card should prove effective to eliminate misrepresentations and deceptions in obtaining appointments with homeowners, or in gaining admittance into homes. If this provision proves unduly onerous, relief from this provision can be requested at a later date.

"The Order also requires respondent's salesmen to give the prospect an opportunity to read the card at the door before any sales presentation can commence. This seems ample disclosure of the purpose of the salesman's visit. Thus, complaint counsel's proposal for different size cards depending upon the method of initial contact with a prospect seems superfluous and is rejected."

The requirement of the Card-at-the-Door was debated in the briefs of counsel on appeal to the Commission. Britannica pointed to testimony that the required presentation of the card would have a devastating effect upon a rational interchange between salesman and prospect. Britannica proposed as less drastic alternatives (1) the requirement of oral disclosure and of training of sales personnel to make such disclosures, and (2) the requirement that the sales representative present an ordinary business card, disclosing his title as "Sales Representative."

Commission counsel argued several aspects of the greater effectiveness of the prescribed card, as compared with an ordinary business card, in giving persons clear notice of the caller's sales purpose and an opportunity to protect themselves from unwanted harassment.

The opinion of the Commission dealt specifically with Britannica's concern over the Card-at-the-Door requirement. Adverting in detail to evidence that Britannica's sales representatives have been trained to conceal the sales purpose of seeking admission to a home, the Commission concluded that "[t]he company-described disguise techniques necessitate inclusion of an order provision requiring clear and conspicuous disclosure of the fact that the representative is a salesman and of the true purpose of gaining entry into the home."

The Commission concluded that the prescribed advice to the customer to keep the card did "not appear to be necessary in order to provide a clear and conspicuous disclosure of the nature and purpose of the call" and omitted that prescription.

*B.* The ALJ summarized his detailed findings concerning "Lead-Getting Activities," in part, as follows:

"EB's magazine and direct-mail advertisements as well as contest entry cards, used to obtain the names of persons who will be contacted by EB's salespersons for the purpose of persuading such persons to purchase EB's products, do not disclose the fact that persons who respond will be contacted by EB's salespersons.—

". . . Respondent also points out that EB's salesmen usually telephone prospects prior to visiting them personally. These fact differences do not change the basic deception inherent in EB's methods. EB's magazine advertisements affirmatively mislead the public into believing that all materials and information

will come by mail—direct from the publisher . . .. Some of the contest entry cards indicate EB is giving away prizes in celebration of its 200th anniversary, that there is no obligation in filling out a card.—

"The *sole* purpose of these activities is to obtain leads to prospects. The only way to protect the public, to correct the misrepresentations in respondent's lead-getting activities, is to inform the public of the true motives behind respondent's offers of free information and prizes—that respondent has a profit motive and will seek to sell its products to those who respond to its devices. These are material facts the public should know. Disclosure that a salesman may call to make a sales presentation of respondent's products and services will correct respondent's misrepresentations and make these material facts available to the public."

The portions of the ALJ's order challenged by Britannica and remedying the practices above described require Britannica to cease and desist from:

"A. Disseminating or causing to be disseminated any advertisement or promotional material which solicits participation in any contest, drawing or sweepstakes, or solicits any response to any offer of merchandise, service or information unless any such solicitation clearly and conspicuously discloses the following statement in 10-point bold-face type:
*NOTICE TO CONSUMER*—PERSONS WHO REPLY AS REQUESTED MAY BE CONTACTED BY A SALESPERSON FOR THE PURPOSE OF SELLING [insert name of applicable product].

"B. Providing any return card, coupon or other device which is used to respond to any advertisement or promotional material covered by Paragraph II A above, unless the following statement clearly and conspicuously appears in 10-point bold-

face type in immediate proximity to the space provided for a signature or other identification of the responding party:
*NOTICE TO CONSUMER*—PERSONS WHO RETURN THIS [insert name of applicable device] MAY BE CONTACTED BY A SALESPERSON FOR THE PURPOSE OF SELLING [insert name of applicable product]."

In discussing these portions of the remedial order, the ALJ wrote as follows:

"EB is prohibited by the Order from disseminating any promotional material or providing any contest entry card which does not clearly disclose that any person responding to such materials may be contacted by a salesperson. This provision does not require that a salesperson call, but merely informs the public of respondent's intent in disseminating such materials and the risks or obligations which may be involved. This is information the public should have, and it does not unduly interfere with any of respondent's business operations."

On appeal to the Commission, Britannica argued that the disclosure is unnecessary and in any event is not the least drastic alternative. Britannica took issue with the choice of words, and suggested that at most there might be a requirement that Britannica disclose in clear print that the responding individual may be contacted to see if he would desire further information on the particular product.

In response, Commission counsel emphasized the support in the record for the fact that a substantial number of consumers do not want visits from encyclopedia salespersons, and that by failing to disclose that those who respond are subject to an unannounced visit by a salesperson, Britannica obtains a greater number of responses.

The opinion of the Commission treated specifically the portion of the order requiring these disclosures in advertising or promotional material which solicits participation in contests and the like, or solicits a response to an offer of merchandise, service, or information. It said:

"The Commission has determined that these order provisions are needed to inform the consumer that the card or coupon response will trigger the delivery of material and information by a sales representative whose call is for the purpose of selling. Such knowledge cannot be gleaned by the consumer who reads the ads or who enters the contest. The ads mislead the consumer in that the wording portrays all information as coming by mail and direct from the publisher. A number of contest entry cards portray the give-away merely as a celebration of the company's bicentennial and suggest that a consumer who fills in the card will not be imposed upon. We reject respondent's contention that disclosure is unnecessary and that the language of the disclosure is 'negative.' "

The Commission's order was issued March 9, 1976.

Britannica does not challenge the sufficiency of the evidence to support the findings of violation, nor does it challenge the propriety of a remedial order. Rather, Britannica focuses its attack on the provisions requiring specified disclosures on initial contact with prospective customers and in certain types of lead-getting material. Britannica argues that these remedial provisions should be set aside because: (1) the disclosures ordered by the Commission are not the least restrictive alternative for curing deception; (2) the Commission failed to state reasons for its choice of remedy in violation of the Administrative Procedure Act, 5 U.S.C. § 557(c); (3) the Commission's order unconstitutionally infringes on Britannica's First Amendment right to advertise and solicit sales; (4) the Commission abused its discretion in its method of enforcement; and (5) Britannica did not have an opportunity to rebut information it believes the Commission considered in selecting the remedy. We will now consider each of these contentions, respectively.

## II. WHETHER THE COMMISSION EXCEEDED ITS STATUTORY AUTHORITY IN REQUIRING THE AFFIRMATIVE DISCLOSURES IN THIS CASE

Once a violation of the Act has been found, our role in reviewing the remedy is a narrow one. As the Supreme Court has stated:

The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.

*Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612–13, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). *See also, e. g., Gilbertville Trucking Co. v. U. S.*, 371 U.S. 115, 130, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 23 (7th Cir.1971).[2] If an FTC order bears no reasonable relationship to the unlawful conduct, however, courts may narrow the scope of the order accordingly. *E. g., Chrysler Corp. v. FTC*, 182 U.S.App.D.C. 359, 366, 561 F.2d 357, 364 (1977); *ITT Continental Baking Co. v. FTC*, 532 F.2d 207, 220–21 (9th Cir.1976). Similarly, courts may modify FTC orders if a less onerous remedy would have the same effect in furthering the governmental interest of preventing deception as the remedy chosen, *FTC v. Royal Milling Co.*, 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933). *Cf., Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir.1976), *cert. denied* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). However, the Commission in framing its remedy is "not limited to prohibiting the precise misrepresentations that had occurred in the past." *National Com'n. on Egg Nutrition v. FTC*, 570 F.2d 157, 163–64.. As the Supreme Court has stated:

---

**2.** It is well established that the Commission is authorized to require affirmative action as a remedy in addition to a cease and desist order. *E. g., Warner Lambert Co. v. FTC*, 183 U.S. App.D.C. 230, 237, 562 F.2d 749, 756 (1977); *Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir.), *cert. denied* 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 274 (1963).

We think it reasonable for the Commission to frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements. As we said in *Federal Trade Comm'n v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081: '[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.' Having been caught violating the Act, respondents 'must expect some fencing in.' *Federal Trade Comm'n v. National Lead Co.*, 352 U.S. 419, 431, 77 S.Ct. 502, 1 L.Ed.2d 438.

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965). *Cf. National Society of Professional Engineers v. United States*, 435 U.S. 679, 698, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

■ We have no hesitancy in concluding that the requirement of the disclosures on initial contact and in the so-called promotional materials were reasonably related to the deceptive practices found. We do not think Britannica seriously contends that required disclosure in some form is an improper remedy, and the choice the Commission made as to form and content of the disclosures could not be deemed an abuse of discretion. These choices were well within the range.

### III. WHETHER THE COMMISSION ADEQUATELY ARTICULATED THE REASONS FOR ITS CHOICE OF PRESCRIBED FORMS OF DISCLOSURE

■ Britannica contends that the remedial provisions under attack must be set aside because the Commission failed to state reasons for its discretionary choice of forms of disclosure. Britannica points to the requirement of 5 U.S.C. § 557(c) (Administrative Procedure Act), that "All decisions . . . shall include a statement of . . findings and conclusions, and the reasons or basis therefor, on all the material issues of . . . discretion presented on the record . . . .." *See also, Burlington Truck Lines v. U. S.*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1942), faulting the ICC for failure to make findings and an analysis to justify its choice between two different available and apparently adequate remedies.

We have set out or summarized the findings, conclusions, and comments of the ALJ and Commission concerning the deceptive practices at which these remedies are directed. There is emphasis on the studied character of the deceptions. We think these clearly set forth adequate reasons for requiring affirmative disclosure of the sales purposes involved rather than a simple command to cease the deception. Britannica suggested to the ALJ and the Commission less onerous forms of disclosure, *i. e.*, oral rather than written (except for an ordinary business card) in the initial contact and less blunt reference to the sales purpose of the contact to be expected by a person answering a promotional ad.

It is true that the ALJ and Commission made no express comparison between the suggested less onerous forms of disclosure and the form adopted. With respect to the initial contact, the ALJ wrote that the card as ordered "should prove effective" and "no satisfactory alternatives are suggested." The Commission asserted the need for "clear and conspicuous disclosure" and indicated its consideration of that standard in deciding to omit the portion of the card suggesting that the recipient keep it. We think there is the clearest implication from these remarks in the context of the record that the alternatives had been considered and been found not to be adequately effective.

With respect to the required disclosure in lead-getting activities, the ALJ wrote "this is information the public should have, and it does not unduly interfere with any of respondent's business operations." The Commission asserted that the provisions "are needed," and rejected Britannica's contention that the language is "negative." Again it seems clear to us that the suggested alternative had been considered and found not to be adequately effective.

*Burlington* is readily distinguishable. There the available remedies were quite different, and the Court found every indication that the remedy not chosen would have been effective. In the present case, the matters at issue are only the form of the disclosure to be required, and it seems clear, though not expressly stated, that the Commission considered the less onerous forms suggested and decided they would not be adequately effective. We do not consider that the Administrative Procedure Act, nor *Burlington* requires us to set aside the challenged provisions because the Commission did not expressly make the comparison.

### IV. WHETHER THE ORDER OF THE COMMISSION INFRINGES ON BRITANNICA'S CONSTITUTIONAL RIGHT TO ADVERTISE AND SOLICIT SALES

■ The proposition that commercial speech enjoys some degree of First Amendment protection can no longer be seriously questioned. *See, e. g., Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *National Com'n. on Egg Nutrition, supra.* It is also beyond question, however, that deceptive advertising is subject to regulation. As the Supreme Court stated in *Bates v. State Bar of Arizona, supra,* 433 U.S. at 383, 97 S.Ct. at 2708:

> Advertising that is false, deceptive, or misleading of course is subject to restraint. See *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. at 771–772, and n. 24, 96 S.Ct., at 1830–1831. Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. *Id.,* at n. 24, 96 S.Ct., at 1830. And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena.

While Britannica does not dispute the general proposition that deceptive advertising can be regulated, it does argue that the affirmative disclosures required by the Commission in this case go beyond the constitutionally permissible.

■ A remedy for deceptive advertising which is broader than is necessary to prevent future deception or correct past deception is impermissible under the First Amendment. *E. g., National Com'n. on Egg Nutrition, supra,* 570 F.2d at 164; *Beneficial Corp. v. FTC, supra,* 542 F.2d at 619. In *National Com'n. on Egg Nutrition, supra,* the FTC ordered a trade association to cease and desist from disseminating advertisements containing statements to the effect that there is no scientific evidence that eating eggs increases the risk of heart disease. The FTC also ordered the trade association to include in any future advertisements or public statements it made regarding the relationship between eating eggs and heart disease the affirmative statement that many medical experts believe eating eggs may increase the risk of heart disease. This court modified this aspect of the order as overbroad under the First Amendment:

> The First Amendment does not permit a remedy broader than that which is necessary to prevent deception . . . . The . . . [additional statement] in its present form would require NCEN [the trade association] to argue the other side of the controversy, thus interfering unnecessarily with the effective presentation of the pro-egg position. The desired preventive effect can be achieved by requiring the disclosure that there is a controversy among the experts and NCEN is presenting its side of that controversy. The additional statement in the form now ordered by the FTC should be required only when NCEN chooses to make a representation as to the state of the available evidence or information concerning

the controversy. As thus modified, the challenged condition would not unnecessarily curtail NCEN's right to present its position. 570 F.2d at 164.

Similarly, in *U. S. v. National Soc. of Professional Engineers,* 181 U.S.App.D.C. 41, 555 F.2d 978 (1977), *aff'd* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the court held that an engineering society violated § 1 of the Sherman Act by adopting and enforcing a rule against competitive fee bidding. The Court of Appeals, however, also held (in a ruling not reviewed by the Supreme Court) that a requirement that the Society state affirmatively that it does not consider competitive bidding to be unethical was contrary to the First Amendment:

> In view of the foregoing, we affirm the district court's decree, except in one respect in which we think the decree is overbroad: It not only enjoins the Society from adopting any policy statement which describes price competition as 'unethical,' but also orders the Society to state affirmatively that it does not consider competitive bidding to be unethical. To force an association of individuals to express as its own opinion judicially dictated ideas is to encroach on that sphere of free thought and expression protected by the First Amendment. 555 F.2d at 984.

Finally, in *Beneficial Corp. v. FTC, supra,* the Third Circuit modified a Commission order which required excision of a short copyrighted and heavily promoted phrase from its advertising material when revision of the context within which the phrase was used could eliminate deception.

■ In the present case, however, the Commission order does not require Britannica to argue a side of a controversy to which it is opposed as in *Egg Nutrition* or *National Soc. of Professional Engineers,* nor does it require Britannica to delete a copy-

righted phrase as in *Beneficial Corp.* Rather, the order of the Commission directs truthful disclosure of Britannica's purposes. Both the public and consumers have a strong interest "that the stream of commercial information flow cleanly as well as freely." *Virginia State Board, supra,* 425 U.S. at 772, 96 S.Ct. at 1831. "Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability." *Bates, supra,* 433 U.S. at 383, 97 S.Ct. at 2708. Moreover, in light of the Commission's finding that clear and conspicuous disclosure is required to prevent future deception by Britannica, we are not persuaded that a remedy ordered by the Commission is not the least restrictive alternative which will adequately further the legitimate governmental interest of the prevention of deception. .

## V. THE COMMISSION'S METHOD OF ENFORCEMENT AGAINST BRITANNICA

■ The Commission has wide discretion in selecting its methods of remedying deceptive and unfair practices. *E. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *FTC v. Universal-Rundle Corp.,* 387 U.S. 244, 251–52, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); *Moog Industries v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). This discretion extends to the decision whether to proceed by rulemaking or adjudication. *E. g., Bell Aerospace Co., supra,* 416 U.S. at 294, 94 S.Ct. 1757; *SEC v. Chenery Corp., supra,* 332 U.S. at 203, 67 S.Ct. 1575.

■ Despite the Commission's discretionary power to proceed by adjudication, Britannica argues that the Commission has no power to enter radically different orders against direct competitors.[3]

---

**3.** Britannica also contends that the Commission violated 5 U.S.C. § 555(e) of the Administrative Procedure Act by denying its petition for rulemaking without analysis or reasons. Whatever the merit of this argument, however, it has no bearing on the validity of the Commission's

order after an adjudicative proceeding in this case. Rule making proceedings and adjudicative proceedings are not necessarily mutually exclusive. *See Lehigh Portland Cement Co. v. FTC,* 291 F.Supp. 628 (E.D.Va.1968), *aff'd* 416 F.2d 971 (4th Cir. 1969).

■ The Commission has the power to act against one firm practicing an industry-wide illegal practice. *E. g., FTC v. Universal-Rundle Corp., supra,* 387 U.S. at 251, 87 S.Ct. 1622; *L. G. Balfour Co. v. FTC,* 442 F.2d 1, 24 (1971); *Rabiner & Jontow, Inc. v. FTC,* 386 F.2d 667, 669 (2d Cir. 1967); *Johnson Products Co. v. FTC,* 549 F.2d 35, 41 (7th Cir. 1977). The Commission must be accorded wide latitude in its enforcement strategy for "the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958).

■ Nevertheless, the discretion of the Commission is not unlimited and may be "overturned . . . [for] a patent abuse of discretion." *Moog Industries, supra,* at 414, 78 S.Ct. at 380; *Johnson Products Co., supra,* 549 F.2d at 41. If the Commission elects to litigate against similarly situated competitors, for example, it cannot place one competitor at a competitive disadvantage by arbitrarily treating one violator differently from another, *Garrett v. F.C.C.,* 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975). As this court has stated:

[T]he Commission's orders are to serve a remedial and not a ˙punitive function, . . . and the Commission may not issue orders which would arbitrarily destroy one of many violators in the market. . . . It is the responsibility of the Commission to perform a 'reasonable evaluation' of the competitive situation to ascertain whether a particular order would be contrary to the purpose of the laws sought to be enforced.

*L. G. Balfour Co., supra,* 442 F.2d at 24 (citations omitted).

■ The facts of this case, however, do not support Britannica's claim of discriminatory treatment. It is true, as Britannica points out, that an earlier order against a minor competitor required only oral disclosure. *P. F. Collier & Son Corp. v.* FTC, 427 F.2d 261, 265–66, footnote 6 (6th Cir. 1970), *cert. denied* 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 186 (1970). Use of a less exacting remedy in a case litigated almost a decade prior to the present controversy does not, however, establish discriminatory enforcement. To establish such a claim, a competitor would have to show not only that competitors were treated differently, but that no rational reason exists to support the differential treatment. Differences in remedy may be attributable to any number of reasons including a realization that earlier remedies were ineffective. A prior insufficient order does not necessitate the insufficiency of all later orders. *P. F. Collier, supra,* 427 F.2d at 276.

■ Recent action by the Commission further demonstrates that Britannica has not been put at a competitive disadvantage as a result of discriminatory enforcement. In a proceeding against Grolier, a principal competitor of Britannica, the Commission imposed a remedy virtually identical to the disputed provisions in this case after a finding that Grolier has been engaging in the same practices as Britannica. *In the Matter of Grolier, Inc.,* FTC Docket No. 8879. The record, therefore, does not support a claim of discriminatory enforcement by the Commission.

## VI.  THE APG ISSUE

Britannica points to a memorandum entitled "Analytical Program Guide for the Direct Selling Industry" (APG) and related documents, which Britannica has attempted to examine, but which have only partially been disclosed. Britannica suggests that the APG may contain "misinformation and undisclosed evidence" which Britannica has not had an opportunity to rebut. Britannica further suggests that the "previously undisclosed evidence [is] of great relevance to the question of remedy in this case."

Britannica first learned of the existence of the APG in May, 1975, and made several motions before the Commission seeking an opportunity to examine and rebut the APG materials before decision by the Commis-

sion. The motions were denied. In denying the last, a motion to reopen the record for this purpose, (March 2, 1976) the Commission referred to Britannica's contention "that the Commission has utilized the documents in the decision-making process in this adjudicative matter" and asserted

"This motion is plainly without merit. The Commission has based its determinations and order in this matter solely upon the record compiled in Docket No. 8908."

In May, 1975 Britannica also began an action in the Northern District of Illinois seeking an injunction against the completion of the proceeding now before us (Docket No. 8908) and also seeking the right to inspect and copy the APG materials under FOIA. The requested injunction was denied, an appeal taken, and this court denied an injunction pending appeal. *Encyclopaedia Britannica, Inc. v. FTC,* 517 F.2d 1013 (7th Cir. 1975). That appeal was dismissed on Britannica's motion June 30, 1975. The action for FOIA relief, proceeded until judgment was entered in favor of FTC March 20, 1979. Britannica has appealed (No. 79–1522).

We are not, of course, deciding Appeal No. 79–1522, although we take judicial notice of the record therein. We have denied a recent motion by Britannica to stay consideration herein until decision of Appeal No. 79–1522. The issues pertaining to Britannica's claim of right to disclosure of additional APG materials under FOIA may well be different from the question whether Britannica has shown that the APG materials so influenced the Commission order here under review that the matter must be remanded to the Commission to reopen the record, disclose the APG materials, and give Britannica an opportunity to rebut them insofar as they might appear to be relevant.

The APG itself is a memorandum dated July 28, 1972, apparently after the staff had recommended to the Commission that a complaint be filed against Britannica, and had submitted a proposed remedial order to be served with the complaint. The author of the APG was a staff attorney, Division of Evaluation, and the Assistant to the Director, Bureau of Consumer Protection. The APG was addressed to Mr. Pitofsky, the Director, and is endorsed with his approval. The full APG contains 79 pages.

Part I of the APG is entitled "Introduction: scope, background and purpose of the memorandum." It contains general observations on the expenditure of effort by the FTC in the past to regulate the abuses of the direct selling industry, a conclusion that the FTC has as yet made little effort to gain an overall perspective on the industry and reference to the question raised by some members of the staff whether the FTC should be involved in regulation of the industry. The stated purpose of the APG is "to provide as adequate a direct selling industry overview as possible and, on the basis of that overview, to propose an appropriate comprehensive FTC regulatory policy to control the industry's abuses."

A secondary purpose is indicated as providing a study of the industry which will preserve relevant experience and ideas of staff for the benefit of future staff when problems in the industry arise.

The sections of the APG, other than the Introduction, are

II. Industry profile, social and economic significance of the industry; patterns of industry regulation; industry trends.

III. Direct selling industry abuses; FTC resource allocation in dealing with these abuses.

IV. Survey of past, present and contemplated FTC direct selling industry regulatory action.

V. Regulatory alternatives; proposed regulatory goals and strategies; evaluation of present programs.

VI. Summary of policy considerations and recommendations.

Clearly enough direct selling of encyclopedias by Britannica and others is within the scope of the APG. The field is divided into high ticket and low ticket categories, based on price, and among thirteen so-called high ticket categories, the sixth includes encyclopedias and other book-form publica-

tions and educational services. In a survey of pending and planned regulatory actions in the field, there is reference to the recommendation pending before the Commission that a complaint be issued against Britannica, along with a reference to an already issued complaint against Grolier, Inc. and consideration of a possible complaint against Field Enterprises, Inc., Britannica's largest competitors.

According to a Second Revised Index filed by the Commission in the FOIA action in district court, the APG "was used by the Bureau of Consumer Protection to evaluate existing and proposed activities in the direct selling industry and was submitted to the Commission as a proposal for such use by the Commission. It was never finally adopted by the Commission."

Summaries in the index do indicate that in portions of APG not disclosed, the author referred to the proposed form of remedial order recommended by the staff to be served with the complaint against Britannica. These references occurred in the course of his survey of past regulation, his discussion of his views as to appropriate order provision, and his discussion of rules which the Commission could adopt. Summaries also indicated that the APG had been submitted to the Commission by Mr. Pitofsky July 31, 1972, with recommendations; that various Commissioners had exchanged their views by memoranda, and that on November 1, 1972, the Commission had directed the staff to perform specified internal tasks with reference to APG.

District Judge Roszkowski, in ordering judgment for the Commission in the FOIA case, noted that he had examined *in camera* the APG and related material. "We have compared the contents of the APG with the allegations found in the Commission's complaint in Docket No. 8908 and find them to be substantially dissimilar." After examining the related materials, he stated, in part, "We simply add that these seventeen documents do not contain private transmittals of binding Commission opinions or legal interpretations which in any fashion constitute secret agency law."

We have before us the formal assurance of the Commission that it has based its determination and order solely upon the record in this proceeding. We must presume the regularity of administrative action, and accordingly that members of the Commission and the ALJ knew and observed the distinction between an adjudicatory proceeding and consideration of problems and policies relevant to the general administrative responsibilities of the Commission. *See United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). We have carefully read the disclosed portions of the APG and the Commission's summaries of the omitted portions and related documents. All are consistent with the APG being a generalized study with recommendations of programs which the Commission might, but apparently has not directed its staff to implement. We have the benefit of Judge Roszkowski's reactions after reading all the material.

■ We are not persuaded of any probability that the fact finding in this adjudicatory proceeding has been influenced by assertions in the APG or that either the ALJ or Commission felt that his or its discretion had been constrained by the APG or any Commission treatment thereof.

The order under review will be affirmed and enforced.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

I respectfully dissent. The issues are fairly presented in the majority opinion, but my view differs.

Britannica does not question on appeal the Commission's underlying findings about prior sales techniques, but objects to the prescribed cures which go beyond a mere cease and desist order. First, the company objects to the requirement for the use of a warning card by sales representatives, and secondly, to the inclusion in all lead-producing advertisements as well as in any provided mail response forms of the "Notice to Consumer" warning.

The Commission has seen fit to dictate the exact size of the warning card, 3″ x 5″, the exact language to be printed on it and "none other," and even the particular type to be used in its printing, 10-point bold face type. Further, with this card in hand a salesman is directed to immediately give it to a prospect and to "direct each such person to read it" before anything else is said or done. The Commission has similarly dictated the wording, size, and type to be used in the "Notice to Consumer" to be contained in the advertising and has specified where the warning is to be placed on return forms. Those measures have been ordered by the Commission without any apparent consideration of the adverse side effects upon Britannica likely to result from its prescription or the use of less onerous alternatives to accomplish its same purposes. I do not see in the record any implication, much less any clear implication as the majority does, that the remedies are the result of a reasoned determination or analysis.

Britannica has suggested acceptable alternative measures to accomplish the same purposes which the company views as not offending legal and constitutional standards. For example, it is suggested that instead of the dictated sales representative's warning card that a fully identifying business card be used coupled with an oral disclosure of the purpose of the sales representative's contact. Britannica suggests that its sales people would be trained to reveal their sales purposes and to avoid anything misleading. Britannica also argues that it should have a little more freedom in composing its own advertising. The company does not object to the elimination of anything which might suggest that a prospect will not be contacted by a sales representative. The company also would be willing to clearly disclose, but in its own words, that prospects who respond to advertising may likely be contacted by a sales representative.

In my view this is a case where an agency, though with good intentions, in its big brother role has unnecessarily intruded too far into the conduct of legitimate business. The Commission surely has more compelling responsibilities than to dictate the size, wording, and printer's type to be used inflexibly by the company. Britannica was not given the opportunity to propose or to submit any less damaging forms of remedies to the Commission for prior review.

The remedies appear to me to go beyond any reasonable cure and are more akin to bureaucratic punishment imposed upon a company found by the Commission to be errant. Britannica makes plain the severe, adverse business impact which can be anticipated by its use of the prescribed stark warnings and procedures. It seems to me that to require a salesperson to use the warning card will suggest to many prospects that the sales representative and his company are afflicted with some strange marketplace malady. Even prospects who are predisposed to acquire for themselves and their families the wealth of information found in an encyclopaedia may be expected to turn to some competitor who does not exhibit such abnormal and strange commercial behavior. After all, to be disturbed by the unexpected call of a sales representative or even to suffer a change of mind after purchase of an encyclopedia ordinarily would not be viewed as injurious to a customer's health. Those persons who show any interest in encyclopaedias may be expected to be those with enough intelligence not to be hopelessly at the mercy of sales representatives. I see no need for making all prospective customers wards of the government when something less may suffice.

When Justice Stevens was a member of this court, he wrote in *Papercraft Corp. v. Federal Trade Commission*, 472 F.2d 927, 933 (7th Cir. 1973):

"We are conscious of the deference to be accorded to the expertise of the administrative agency, particularly in the fashioning of remedies. But when it selects an untried and blunt instrument which will certainly cause some impairment of statutory objectives [competition], we require a more careful exposition of its justification before we will sanction it as

a proper remedial tool. The Commission failed to make an adequate demonstration of the need for its exceptional remedy."

That comment is not without some relevance to this case. We are not bound by our deference to the Commission's expertise to sanction any remedy the Commission may impose without explanation, or analysis, or any other visible justification when there is the reasonable likelihood that something less harsh to a legitimate business would accomplish the same Commission objectives. As in *Siegal Co. v. Federal Trade Commission*, 327 U.S. 608, 613, 66 S.Ct. 758, 90 L.Ed. 888 (1940), we are left in the dark as to why some less drastic and damaging remedy would not suffice.

The Commission has brought to our attention the Supplemental Opinion on Petition for Rehearing in *Warner-Lambert Co. v. Federal Trade Commission*, 183 U.S.App. D.C. 230, 562 F.2d 749 (1977). That opinion explains why certain corrective advertising was considered justified to overcome 50 years of deceptive advertising in which Listerine had been proclaimed and purchased as a remedy for colds. However, even in those circumstances Judge Robb dissented on the basis that the corrective advertising was beyond the Commission's statutory authority and that the Commission had no authority to punish or impose liability for past conduct. In any event, there is no lingering effect of prior advertising needed to be overcome in the present case.

I would prefer to deny enforcement of the Commission's order and remand for reconsideration of a more appropriate remedy to be supported by a rational analysis.

There remains the additional issue involving certain materials sought by Britannica under the Freedom of Information Act which the company fears may have exerted some influence on the Commission outside the record. A separate appeal is pending which is an outgrowth of that issue. The majority presumes the regularity of the administrative action. Since the objectionable remedies imposed stand unsupported in the record, I would wait in the resolution of this case until we are fully informed about the other appeal and its possible effect, if any, upon this case. That would consolidate related matters and avoid to some extent having to rely on implications and presumptions in resolving this case.