**NATIONAL COMMISSION ON EGG NUTRITION and Richard Weiner, Inc., Petitioners-Appellants,**

v.

**FEDERAL TRADE COMMISSION, Respondent-Appellee.**

**Nos. 76–1969 and 76–1975.**

United States Court of Appeals, Seventh Circuit.

Argued June 17, 1977.

Decided Nov. 29, 1977.

As Amended Dec. 6, 1977.

Supplemental Opinion on FTC's Motion to Amend Judgment Jan. 23, 1978.

James L. Fox, Donald P. Colleton, Chicago, Ill., for petitioners-appellants.

John T. Fischbach, Atty., F. T. C., Washington, D. C., for respondent-appellee.

Before SPRECHER and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

The subject of this appeal is commercial speech under the First Amendment. Acting pursuant to its power to prohibit false and misleading advertising, the Federal Trade Commission has entered a final order directing petitioners to cease and desist from disseminating advertisements containing statements to the effect that there is no scientific evidence that eating eggs increases the risk of heart and circulatory disease.[1] Certain statements ancillary to the one just described are also prohibited, and the right to make still others is limited and condi-

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The term "heart and circulatory disease" is used in this opinion to include, in the Commission's phrase, "heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition."

tioned by the order. We sustain the order, except for a provision which we hold to be overbroad.

Petitioners are a trade association that calls itself the National Commission on Egg Nutrition (NCEN), and its advertising agency, Richard Weiner, Inc. Despite its official-sounding title, NCEN was formed by members of the egg industry, to counteract what the FTC described as "anti-cholesterol attacks on eggs which had resulted in steadily declining per capita egg consumption." To carry out this mission, NCEN, with Weiner's assistance, mounted an advertising and public relations campaign to convey the message that eggs are harmless and are needed in human nutrition. In 1974 the FTC filed a complaint charging petitioners with having violated §§ 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45, 52, by placing newspaper advertisements containing various false and misleading statements with respect to the relationship between eating eggs and heart and circulatory disease. In its answer, NCEN admitted that it had made representations in its advertising concerning the absence of scientific evidence that eating eggs increases the risk of heart and circulatory disease and also had represented that eating eggs does not increase the blood cholesterol level in a normal person, but stated that it was no longer making such representations in its advertising. NCEN did not contest that other representations charged were misleading but denied having made them.

After filing its complaint, the FTC sought a temporary injunction in the District Court under § 13(a) of the Federal Trade Commission Act, 15 U.S.C. § 53(a), to prohibit NCEN from continuing its allegedly false advertising while the administrative proceeding was pending. The District Court denied the relief sought by the FTC. We reversed and directed the entry of an injunction forbidding the misrepresentations complained of but allowing NCEN to make "a fair presentation of its side of the controversy." *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485, 489 (7th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976).

After hearing the evidence, an administrative law judge sustained the allegations of the complaint and recommended a cease and desist order. On appeal to the FTC, the ALJ's findings were sustained and the recommended order was adopted with some modifications. NCEN and Weiner have filed petitions for review of that order by this court. Only NCEN has filed a brief.

The order directs NCEN and Weiner to cease and desist from disseminating, by mail or means in or affecting commerce, advertising which directly or indirectly makes certain specified representations. The one which is of principal concern here is "that there is no scientific evidence that eating eggs increases the risk of . . . heart [and circulatory] disease . . . ." Other specifically prohibited statements, which the FTC found petitioners had made in the past, are variations on the same general theme.[2] In addition, any representation concerning the relationship of eating eggs, or of dietary cholesterol, including

---

**2.** Petitioners are forbidden from making any statement which directly or indirectly represents

 . . . that there is scientific evidence that dietary cholesterol, including that in eggs, decreases the risk of . . . heart [and circulatory] disease . . .;
 . . . that there is scientific evidence that avoiding dietary cholesterol, including that in eggs, increases the risk of . . . heart [and circulatory] disease . . .;
 . . . that eating eggs does not increase the blood cholesterol level in a normal person;

 . . . that the blood cholesterol level is prevented from being raised or lowered by dietary cholesterol intake;
 . . . that the human body increases its manufacture of cholesterol in an amount equal to a decrease in dietary cholesterol intake;
 . . . that the average human body eliminates the same amount of cholesterol as that eaten;
 . . . that dietary cholesterol, including that in eggs, is needed by the body for building sex hormones, for transmitting nerve impulses and for maintaining life in cells . . .

that in eggs, to heart and circulatory disease, is permissible only if

it is clearly and conspicuously disclosed in immediate conjunction therewith that many medical experts believe that existing evidence indicates that increased consumption of dietary cholesterol, including that in eggs, may increase the risk of heart disease.

Also forbidden is any statement which

[r]epresents as insignificant the available scientific evidence that the consumption of dietary cholesterol, including that in eggs, may increase the risk of . . . heart disease, . . . or represents that there is overwhelming scientific evidence or otherwise misrepresents the amount of scientific evidence that eating eggs does not increase the risk of . . heart disease . . . [or] [m]isrepresents in any other manner the physiological effects of consuming dietary cholesterol or eggs.

The order also prohibits NCEN from using its name ". . . unless it is clearly and conspicuously disclosed in immediate conjunction with the name that the National Commission on Egg Nutrition is composed of egg producers and other individuals and organizations of, or relating to, the egg industry."

■ NCEN does not challenge the requirement that it identify itself as a trade association if it wishes to continue using its current title. Nor does it specifically challenge the findings that the various statements found to have been made, other than the "no scientific evidence" statement, were false and misleading. The debate before us is focused on that statement, *i. e.*, that there is no scientific evidence linking the eating of eggs to an increased risk of heart and circulatory disease. NCEN argues, first, that the statement is true; second, that even if it is misleading, the FTC's prohibition infringes upon NCEN's First Amendment rights; and, finally, that even if the FTC's holding of a violation is upheld, its order is unconstitutionally vague and overbroad, going beyond what is necessary to remedy that violation.[3]

### I. *Falsity*

■ What the FTC describes as the "diet/heart disease" hypothesis, subscribed to by "many well-qualified medical science experts . . ., with varying degrees of conviction," is as follows: For many people, the amounts of cholesterol and saturated fats which are ingested affect the risk of heart and circulatory disease; increasing the amounts increases the risk, and decreasing the amounts decreases the risk.

Egg yokes contain substantially more cholesterol than any other commonly eaten food and are a major contributor of cholesterol in the American diet. The yoke of one egg provides cholesterol in an amount equal to about one-third of the average daily per capita consumption of cholesterol. (Although the yoke also contains saturated fat, the amount per egg is equal to less than four percent of the average per capita intake of that substance.)

The diet/heart disease hypothesis is based on several propositions: First, in many people the cholesterol level in the blood stream (serum cholesterol) is affected by the amount of cholesterol and saturated fat in the diet. Second, relatively high levels of serum cholesterol have been associated with relatively high incidence of coronary heart disease in sample populations. Third, relatively high levels of serum cholesterol contribute to the formation of atherosclerotic lesions, which precipitate heart disease. These propositions have been formulated by scientists based upon, in the FTC's words, "the results of a large body of clinical-pathological, experimental, and epidemiological studies." After describing these studies, the ALJ had found that they

---

**3.** The Association of National Advertisers, Inc., in an *amicus* brief filed in support of NCEN, argues that the FTC's hearing procedures violated the First Amendment standards set forth in *Blount v. Rizzi*, 400 U.S. 410, 417, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971). As the FTC points out, however, this argument was not made before the FTC or even by the petitioners themselves in this court and is therefore not properly before us. See *American Meat Institute v. Environmental Protection Agency*, 526 F.2d 442, 449 (7th Cir. 1975).

were conducted using scientific methodologies, were performed by competent and highly regarded investigators, have been reported in recognized scientific journals after peer review, and have been generally accepted by experts in the field and by the scientific community.

These administrative findings of fact are not challenged by NCEN. Instead, it relies upon testimony of its own expert witnesses that some scientists and doctors are not persuaded by the studies, and that in the opinion of the witnesses the studies are not "evidence" and, in the words of one witness, "would not convince anybody that the number of eggs consumed does increase the risk of ischemic heart disease."

The FTC concluded that, impossible though it may be to determine whether consuming eggs in fact increases the risk of heart and circulatory disease, it is possible to determine the existence and amount of evidence on that issue. Referring to the testimony of NCEN's experts that, in their opinion, there was no evidence of a connection between eggs and heart and circulatory disease, the FTC said that

in rendering their testimony respondents' witnesses did not dispute the fact that many experts, in the exercise of reasonable, albeit disputed, scientific judgment, have relied upon a large body of scientific studies in formulating the diet/heart disease hypothesis.

Responding to the argument that the "no evidence" statement would be recognized by readers as merely an expression of opinion, the FTC said,

Unfortunately, however, the phrase "there is no evidence" is also, and perhaps more reasonably subject to the interpretation that "there do not exist competent

and reliable scientific studies from which well-qualified experts could reasonably hypothesize that eating eggs increases the risk of heart disease." This latter message is patently false and misleading.[4]

As the Third Circuit observed in *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977), "[w]hether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law." Applying the "substantial evidence" rule, and giving due regard to the FTC's expertise, we cannot disturb the finding.

Moreover, our own finding, if it were our province to make one, would be less charitable to petitioners than that of the FTC. The various scientific studies and the expert opinions based on those studies constitute evidence, not merely in the legal sense, but in the commonly understood sense of that word. That a given expert is not persuaded by the studies does not remove them, or another expert's contrary opinion, from the category of evidence. After reviewing the record now before us, we find no reason to alter the conclusion stated in our opinion on the interlocutory appeal:

NCEN has done more than espouse one side of a genuine controversy . . . . It has made statements denying the existence of scientific evidence which the record clearly shows does exist. These statements are, therefore, false and misleading.

517 F.2d at 489.

## II. *The First Amendment*

The argument most strongly pressed is that the FTC's order impinges upon First

---

**4.** The FTC went on to say,

It is well established, and critical to the notion of preventing false advertising, that where an advertisement conveys more than one meaning, one of which is false, the advertiser is liable for the misleading variation. *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1963); *Rhodes Pharmacal Co. v. Federal Trade Commission*, 208 F.2d 383, 387 (7th Cir. 1953), modified by restating the Commission's order, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1953). Nor does our

application of that principle in this instance rest upon some mere semantic quibble or strained interpretation of words, since that meaning of respondents' claim which deceives is one which is likely to be understood, and reasonably so, by consumers. A more appropriate statement of the principle in this case might thus be that an otherwise false advertisement is not rendered acceptable merely because one possible interpretation of it is not untrue.

Amendment guarantees, which, at least since *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), extend to commercial speech. It is argued that the principles established in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), prohibit the agency from considering the content of the statement without reference to the state of mind with which it was uttered, and require that a commercial misrepresentation on a controversial public issue be treated in the same manner as it would a libel of a public figure, see *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *i. e.*, as actionable only if it is made deliberately or with reckless disregard for the truth.

In the *Virginia Pharmacy* opinion, upon which NCEN relies, the Court expressly recognized that the First Amendment did not interfere with a "State's dealing effectively" with the problem of "deceptive or misleading" commercial speech, even when it is "not provably false, or even wholly false." The state is not prohibited "from insuring that the stream of commercial information flow cleanly as well as freely." 425 U.S. at 771–772, 96 S.Ct. at 1831. This position was amplified by the Court in *Bates v. State Bar of Arizona*, 433 U.S. 350, 381–384, 97 S.Ct. 2691, 2708–2709, 53 L.Ed.2d 810 (1977):

> Advertising that is false, deceptive, or misleading of course is subject to restraint. See *Virginia Pharmacy Board v. Virginia Citizens Council*, 425 U.S. at 771–772 [96 S.Ct. 1817] and n. 24 . . . . Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. *Id.*, at n. 24 . . . . And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for un-

truthful or misleading expression that has been allowed in other contexts has little force in the commercial arena.

See also Mr. Justice Stevens' statement in *Young v. American Mini Theatres*, 427 U.S. 50, 68–69, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); and see *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977).

■ The Court's recognition that the First Amendment does not preclude restraint of false, misleading, or deceptive advertising is consistent with the principle that the protection afforded to speech of any kind is to be determined by "assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Bigelow v. Virginia, supra*, 421 U.S. at 826, 95 S.Ct. at 2235. The First Amendment interest is twofold: it embraces the interests of both the speaker and the prospective audience, which, in the case of commercial speech, consists of consumers. The consumers' interest, which is in obtaining information on which to base the decision of whether to buy, see *Linmark Associates, Inc. v. Township of Willingboro, supra*, 97 S.Ct. at 1618, is served by insuring that the information is not false or deceptive, and, in fact, coincides with the public interest served by the regulation. The fact that health is involved enhances the interests of both consumers and the public in being assured "that the stream of commercial information flow cleanly as well as freely." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra*, 425 U.S. at 772, 96 S.Ct. at 1831. When these considerations, together with those expressed by the Court in *Bates* relating to the hardiness of commercial speech, are balanced, the scale is tipped in favor of regulation.

■ NCEN argues that its advertisements do not fit the paradigm of commercial speech which the Court had in mind in *Virginia Pharmacy, viz.*, "speech that does 'no more than propose a commercial transaction,' " 425 U.S. at 771, 96 S.Ct. at 1830, n. 24, quoting from *Pittsburgh Press Co. v.*

*Human Relations Comm'n*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), but rather were expressions of opinion on an important and controversial public issue. Thus, it is said, they are more like the paid political advertisements in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). First, as to the nature and purpose of NCEN's statements, they were not phrased as statements of opinion but categorically and falsely denied the existence of evidence that in fact exists and were made for the purpose of persuading the people who read them to buy eggs. Second, as to the nature of the issue, the right of government to restrain false advertising can hardly depend upon the view of an agency or court as to the relative importance of the issue to which the false advertising relates. Third, as to the intended scope of the Supreme Court's expressions on the subject of commercial speech, we believe they were not intended to be narrowly limited to the mere proposal of a particular commercial transaction but extend to false claims as to the harmlessness of the advertiser's product asserted for the purpose of persuading members of the reading public to buy the product. The nature of the communication is not changed when a group of sellers joins in advertising their common product. See Note, *Protection for Commercial Advertising*, 44 U.Chi.L.Rev. 205, 231 (1976). The considerations the Court has viewed as distinguishing commercial speech from other speech, stated in the passage from *Bates* quoted above, are present here. The order does not offend the First Amendment.

### III. *Vagueness*

NCEN's argument that the order is unconstitutionally vague is based on the ALJ's statement of his reasons for not "predicat[ing]" a "finding of violation" on certain of the materials published by NCEN. In the material in question were quotations from an advisory report of a committee of British experts published by the British Government and from an edito-

rial in an American medical journal, and commentary by NCEN critical of governmental action, including that of the FTC in this case. The ALJ said these materials "may warrant First Amendment protection," because they lacked the "strong promotional message" of the condemned material, were "basically true," contained information which was "a matter of public concern," and constituted "comment on government action." The FTC, however, stated,

> [W]e must reject the suggestion attributed to the ALJ . . . that [the materials just described] are necessarily not commercial publications, although they do not form the basis for our finding of liability in this matter.

In addition, after defining "advertising" to require a "tendency or capacity to induce the sale of the product," the FTC said,

> Publications designed to convey the point that consumption of a particular product, will not increase the risk of heart disease, are clearly likely to induce the purchase of that product. The fact that the message is conveyed by means of selected quotations from the works of scientists and popular writers does not alter the commercial character of the publication. Nor is it altered by self-serving professions of eleemosynary intent, e. g. "Brought to you in the public interest".[*] If anything the misleading effect of respondents' advertisements is enhanced by casting them in the guise of a "public service message" presented by an unidentified "National Commission".

The FTC's pronouncement eliminates any confusion the ALJ's statement may have caused. Further clarification is available from the FTC upon request, if the need arises. 16 C.F.R. § 3.61(d). See *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). Neither the use of the term "advertisement" nor the comments of the ALJ on which NCEN bases its argument render the order unconstitutionally vague.

The FTC's order also prohibits (in paragraph I, C) advertising which

---

* Some of the advertisements carried this legend.

represents as insignificant the available scientific evidence that the consumption of dietary cholesterol, including that in eggs, may increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition . . . .

or which

otherwise misrepresents the amount of scientific evidence that eating eggs does not increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition.

NCEN attacks this language as unconstitutionally vague. The FTC was of course not limited to prohibiting the precise misrepresentations that had occurred in the past. Here, as in *FTC v. Colgate-Palmolive Co.,* supra, 380 U.S. at 393, 85 S.Ct. at 1047, the challenged language is "as specific as the circumstances will permit." In that case, the Court also stated,

We think it reasonable for the Commission to frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements. As we said in *Federal Trade Comm'n v. Ruberoid Co.,* 343 U.S. 470, 473 [72 S.Ct. 800, 96 L.Ed. 1081]: "[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." Having been caught violating the Act, respondents "must expect some fencing in." *Federal Trade Comm'n v. National Lead Co.,* 352 U.S. 419, 431 [77 S.Ct. 502, 1 L.Ed.2d 438].

380 U.S. at 395, 85 S.Ct. at 1048. The challenged provision is not unconstitutionally vague.

## IV. *The Required Additional Statement*

The order also directs NCEN to include in any future advertisements or public statement it makes concerning the relationship between eating eggs and heart and circulatory disease, the further statement that many medical experts believe increased consumption of dietary cholesterol, including that in eggs, may increase the risk of heart disease. (Paragraph I, B.) NCEN argues that, even if its advertisements contained misrepresentations, this provision of the order exceeds that which is necessary to prevent repetition of the violation.

 The First Amendment does not permit a remedy broader than that which is necessary to prevent deception, *Beneficial Corp. v. FTC,* supra, 542 F.2d at 619–620, or correct the effects of past deception, *Warner-Lambert Co. v. FTC,* 562 F.2d 749, 760 (D.C.Cir. 1977). In its present form, the challenged condition on the right to make an assertion that is not deceptive does not meet this test. Because the record here, unlike that in *Warner-Lambert Co. v. FTC,* supra, does not show a long history of deception which has so permeated the consumer mind that the "claim was believed by consumers after the false advertising had ceased," id., at 771, we are concerned primarily with preventing future deception. The condition in its present form would require NCEN to argue the other side of the controversy, thus interfering unnecessarily with the effective presentation of the pro-egg position. The desired preventive effect can be achieved by requiring the disclosure that there is a controversy among the experts and NCEN is presenting its side of that controversy. The additional statement in the form now ordered by the FTC should be required only when NCEN chooses to make a representation as to the state of the available evidence or information concerning the controversy. As thus modified, the challenged condition would not unnecessarily curtail NCEN's right to present its position.

If the provision requiring an additional statement is so modified by the FTC, it will be enforced. The rest of the order will be enforced in its present form.

ENFORCED IN PART.

## SUPPLEMENTAL OPINION ON FTC'S MOTION TO AMEND JUDGMENT NUNC PRO TUNC

The FTC has moved that we amend the above opinion "by performing the modification of the portion of the Commission's or-

der requiring affirmative disclosure of certain facts directed [in Part IV] of that opinion." A proposed form of order is submitted with the motion.[5] In response, petitioners oppose the motion, and also ask, in effect, that we reconsider other portions of our opinion.

Petitioners having omitted to file a petition for rehearing within the time allowed by Rule 40(a), Fed.R.App.P., we decline to entertain their request for reconsideration. Insofar as their arguments relate to their interpretation of Part IV of the opinion, they are without merit. It is true, as we said there, that this record does not show effects of the deceptive advertising on the consumer mind comparable to those in the *Warner-Lambert* case, and therefore "we are concerned *primarily* with preventing future deception" (emphasis supplied). The past cannot be totally ignored, however. Concrete evidence of past effects is likely to be difficult and expensive, if not impossible, to obtain in most deceptive advertising cases.[6] Even though such evidence is not present, the FTC is entitled to draw reasonable inferences as to the effects deceptive statements are likely to have had upon consumers. Although the weight we can give to these effects in the present case is limited by the absence of any findings by the FTC on the subject, we are at least entitled to assume that many persons interested in the egg-cholesterol question have read NCEN's advertisements, as it was intended

they should, and that therefore enough taint remains to justify the limited corrective advertising order we have approved.[7]

The revised order the FTC now asks us to enter, which appears as an appendix hereto, carries out the directions contained in Part IV of our opinion. Inasmuch as that order is presumably the one that would be adopted by the FTC if the case were returned to it, there is no reason to delay the proceeding by a remand. Accordingly, the order entered by the FTC is modified to read as shown in the appendix and, as modified, is ordered enforced.

ENFORCED AS MODIFIED.

APPENDIX

The full text of the order of the Federal Trade Commission as modified, affirmed, and enforced by the Court is:

IT IS ORDERED that respondents National Commission on Egg Nutrition and Richard Weiner, Inc., corporations, their successors and assigns, either jointly or individually, and respondents' officers, agents, representatives, and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of eggs for human consumption do forthwith cease and desist from:

 A. Disseminating or causing the dissemination of any advertisement by

---

**5.** In a footnote in its supporting memorandum, the FTC states that its motion is not a concession of the correctness of the modification and reserves the right to file a petition for certiorari on this question.

**6.** See R. Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising,* 90 Harv.L.Rev. 661, 698 (1977):

 . . . Comparable proof of deception-perception-memory influence would be virtually impossible in most advertising cases.

 If the Commission is to do an effective job in regulating deceptive advertising, corrective advertising must apply to more than the one-in-a-million type of ad campaign present in *Warner-Lambert.*

(Footnote omitted.)

**7.** See Judge J. Skelly Wright's statement in *Warner-Lambert Co. v. FTC,* 562 F.2d 749, 770 (D.C.Cir.1977):

 . . . [W]hatever incremental chill is caused by a corrective advertising order beyond that which would result from a cease and desist order may well be necessary if the interest of consumers in truthful information is to be served at all. Otherwise, advertisers remain free to misrepresent their products to the public through false and deceptive claims, knowing full well that even if the FTC chooses to prosecute they will be required only to cease an advertising campaign which by that point will, in all likelihood, have served its purpose by deceiving the public and already been replaced.

See also *Pitofsky, supra,* n. 6, at 692–693 and nn. 129–130, and Note, *"Corrective Advertising" Orders of the Federal Trade Commission,* 85 Harv.L.Rev. 477, 482–483 (1973), both of which Judge Wright cites in support of the quoted statement.

means of the United States mails or by any means in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, which directly or indirectly

1. Represents that there is no scientific evidence that eating eggs increases the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition;

2. Represents that there is scientific evidence that dietary cholesterol, including that in eggs, decreases the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition;

3. Represents that there is scientific evidence that avoiding dietary cholesterol, including that in eggs, increases the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition;

4. Represents that eating eggs does not increase the blood cholesterol level in a normal person;

5. Represents that the blood cholesterol level is prevented from being raised or lowered by dietary cholesterol intake;

6. Represents that the human body increases its manufacture of cholesterol in an amount equal to a decrease in dietary cholesterol intake;

7. Represents that the average human body eliminates the same amount of cholesterol as that eaten;

8. Represents that dietary cholesterol, including that in eggs, is needed by the body for building sex hormones, for transmitting nerve impulses and for maintaining life in cells; or

9. Utilizes the name "National Commission on Egg Nutrition" unless it is clearly and conspicuously disclosed in immediate conjunction with the name that the National Commission on Egg Nutrition is composed of egg producers and other individuals and organizations of, or relating to, the egg industry.

B. Disseminating, or causing the dissemination, of any advertisement by means of the United States mails or by any means in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, which directly or indirectly

1. Represents that eating eggs does not increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition or

2. Makes any representation concerning the relationship of dietary cholesterol, including that in eggs, to heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition

*unless* it is clearly and conspicuously disclosed in immediate conjunction therewith that there is a controversy among medical experts concerning the relationship of dietary cholesterol, including that in eggs, to heart disease, and that respondents are presenting their side of that controversy.

C. Disseminating, or causing the dissemination of, any advertisement by means of the United States mail or by any means in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, which directly or indirectly

1. Represents that there exists, or describes, scientific evidence which supports the theory that consumption of dietary cholesterol, including that in eggs, does not increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition or

2. Makes any representation concerning the state of the available evidence or information concerning the relationship of dietary cholesterol, including that in eggs, to heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition

*unless* it is clearly and conspicuously disclosed in immediate conjunction therewith that many medical experts believe that existing evidence indicates that increased consumption of dietary cholesterol, including that in eggs, may increase the risk of heart disease.

D. Disseminating, or causing the dissemination of, any advertisement by means of the United States mails or by any means in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, which directly or indirectly

1. Represents as insignificant the available scientific evidence that the consumption of dietary cholesterol, including that in eggs, may increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis, or any attendant condition, or represents that there is overwhelming scientific evidence or otherwise misrepresents the amount of scientific evidence that eating eggs does not increase the risk of heart attacks, heart disease, atherosclerosis, arteriosclerosis or any attendant condition.

2. Misrepresents in any manner the physiological effects of consuming dietary cholesterol or eggs.