**PUERTO RICO TELE–COM, INC., Plaintiff,**

v.

**Jorge R. OCASIO RODRIGUEZ, as Secretary of the Consumer Affairs Department, and in his personal capacity, Defendant.**

**Civ. No. 90–1840 (JAF).**

United States District Court, D. Puerto Rico.

July 24, 1990.

---

Rafael Escalera–Rodriguez, Lasa Escalera & Reichard, San Juan, P.R., for plaintiff.

Mayra Maldonado Colón, Atty., Carlos E. Rodríguez Quesada, Director, Federal Litigation Div., Héctor Rivera Cruz, Secretary of Justice, Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Puerto Rico Tele–Com, Inc. ("PR Tele–Com") is a corporation organized for the purpose of providing long-distance telephone service to residents of Puerto Rico. PR Tele–Com brought this action after Puerto Rico's Department of Consumer Affairs ("DACO") issued cease and desist orders against three PR Tele–Com advertisements which DACO determined to be misleading and inaccurate. There are two named defendants: Jorge R. Ocasio Rodríguez (DACO's Secretary) and Pedro Canabal (Director of DACO's Division of Examiners). Claims for injunctive and

monetary relief are based on 42 U.S.C. section 1983 and the first and fourteenth amendments to the United States Constitution. In addition, PR Tele–Com alleges violations of local law. After this court denied plaintiff's motion for a temporary restraining order, a preliminary injunction hearing was held on June 27, 1990. Pursuant to Fed.R.Civ.P. 65(a)(2), we now consolidate a decision on the preliminary injunction issue with a decision on the merits of plaintiff's claim for injunctive relief.

## I.

The present controversy has arisen against the backdrop of a Federal Communications Commission ("FCC") resolution ordering that Puerto Rico's long-distance telephone service market be opened up to new competitors. Pursuant to this order, Puerto Rico Telephone Company ("PRTC"), which is the local carrier, and the Communications Authority have initiated an "Equal Access" campaign whereby PRTC's customers may select one of several competing companies to handle their long-distance calls. Selection of a long-distance carrier is to be done by balloting on or before July 30, 1990. Those customers who fail to indicate a preference for one company will have a carrier chosen for them by random selection.

Plaintiff PR Tele–Com is one such company presently competing for a share of Puerto Rico's long-distance market. PR Tele–Com is organized under the laws of Puerto Rico and was represented at the hearing by its Residential Sales Director, Leslie Hufstetler Oquendo. As a relative newcomer to the market, PR Tele–Com does not currently provide service to any customers in Puerto Rico, although according to Hufstetler's unrebutted testimony it has made substantial investments in equipment, personnel, and licenses, and is both legally and technically capable of servicing clients by September 28, 1990, the date the Equal Access system is scheduled to be implemented.

DACO is a Puerto Rico agency charged by its enabling act with the responsibility of protecting the interests of the island's consumers. 3 L.P.R.A. § 341b. DACO's Secretary is granted broad powers with which to execute this responsibility, including the power to inspect and regulate deceitful or untruthful advertisements. 3 L.P.R.A. § 341e(j). DACO is also empowered to "carry out all kinds of studies and investigations on matters affecting the consumer...." 3 L.P.R.A. § 341m(a). All information obtained as the result of DACO's power to carry out studies and investigations has been deemed to be of a public nature, except where it incriminates the deponent or constitutes a secret of production, or is protected by the federal legislation on patents. 3 L.P.R.A. § 341m(d).

Pursuant to its investigatory powers under section 341m, DACO issued a report discussing the Equal Access campaign. This report, released on May 17, 1990, describes the carrier selection procedures and discusses the criteria subscribers ought to use in making their decisions. DACO found four criteria to be relevant: rates, service, quality of connections, and geographical coverage. The report goes on to discuss one criterion—rates—in greater detail, promising to carry out an analysis of the companies' service and quality in the "near future." With regard to rates, DACO conducted a comparative analysis of six competing companies and concluded that two companies—PR Tele–Com and Telefónica Larga Distancia—generally offered the most economical residential service, while AT & T generally had the most expensive rates. This conclusion was backed up by tables showing the rates of each company with respect to calls made at different times of the day and to different locations.

Sometime after DACO's study was published, PR Tele–Com began citing DACO's conclusions in its newspaper, television, and radio advertisements. As a general matter, these advertisements make prominent use of DACO's conclusion that PR Tele–Com's rates were the "lowest" or "lower than AT & T's." Hufstetler testified that PR Tele–Com wanted to use the DACO study in its advertising campaign, first, because the results of the study were

favorable to PR Tele–Com, and second, because an association with DACO increased the company's credibility in the minds of consumers.

More specifically, the dominant feature of the newspaper ad is the presence of large, dark, bold letters which read "DACO SAYS IT." Underneath this statement, in smaller print, is the assertion, "Only Puerto Rico Tele–Com guarantees it!" The ad goes on to list four "guarantees":

1. Lower rates than 137 or A.T. & T. to the U.S. minute for minute, plan for plan, hour for hour.

2. Clear and consistent communication through an all digital fiber optic network from coast to coast.

3. Complete satisfaction or we'll connect you to another company free.

4. One hour free!

To the right of all of this, PR Tele–Com reproduces DACO's tables comparing different companies' rates to the East Coast, the Dominican Republic, the Virgin Islands, and Venezuela.

PR Tele–Com's radio advertisement runs as follows:

Unidentified Announcer: "Luis Francisco Ojeda talks about long distance rates."

Luis Francisco Ojeda: "Do you know who says there are lower rates than 137 or AT & T? DACO says it. In its May study entitled 'Equal Access and Long Distance Calls.' According to DACO, the rates lower than AT & T to the Dominican Republic, Argentina, Great Britain, Venezuela, the U.S. Virgin Islands, New York, Florida, and the entire East Coast of the United States are from Puerto Rico Tele–Com. DACO affirms it and Puerto Rico Telecom guarantees it. Lower rates than 137 and AT & T."

Unidentified Announcer: "In long distance calls, decide for sure: Puerto Rico Tele–Com."

Finally, the "voiced" text of PR Tele–Com's television commercial pretty much

follows the text of the radio ad.[1] The visual aspect of the commercial, however, in addition to the usual innocuous footage, reproduces some of DACO's tables and flashes statements such as "Lowest Rates to the Dominican Republic."

On June 12, 1990, pursuant to its power under 3 L.P.R.A. section 341e(j), DACO issued a preliminary cease and desist order against PR Tele–Com ordering it to refrain from publishing any print ads regarding long-distance call service which make reference to the DACO study. This order also scheduled an administrative hearing for June 21, 1990, at which PR Tele–Com was required to show cause why the preliminary order should not be made permanent and why PR Tele–Com should not be fined $5,000 for every violation to the order and/or for every violation to the rules and regulations used as a basis for the order. On or around June 19, DACO issued two more preliminary cease and desist orders similar to the first one except that these were directed at PR Tele–Com's radio and television advertisements. Separate administrative hearings on these orders were scheduled for June 28 and July 2.

The cease and desist orders against the radio and television advertisements cited two main objections. First, the orders found that the ads misleadingly implied that only PR Tele–Com offered rates lower than AT & T's, whereas in truth other companies shared this distinction with plaintiff. Second, the cease and desist orders found that the use of present tense verbs in the ads gave the false impression that PR Tele–Com was an established company already servicing clients in Puerto Rico, whereas plaintiff will not in fact begin providing service until September 28, 1990. The terms of the cease and desist orders against the radio and television ads are in force today.

On June 21, DACO held an administrative hearing regarding the newspaper ad-

---

**1.** The television announcer says: "Do you know who says there are lower rates than 137 or AT & T? DACO says it. According to DACO, the rates lower than AT & T to the Dominican Republic, Great Britain, Venezuela, the Virgin Islands, New York, Florida and the entire eastern coast of the United States are from Puerto Rico Tele–Com. DACO affirms it and Puerto Rico Tele–Com guarantees it. That's why in Long Distance, decide for sure: Puerto Rico Tele–Com."

vertisement. The following day, Hearing Examiner Canabal issued a resolution concluding that PR Tele–Com, through its newspaper ads, portrayed the false impression that DACO endorsed some warranties offered by the company and that references to DACO's study were in other ways deceiving. DACO fined PR Tele–Com $5,000 for a rules violation and another $5,000 for disobeying the preliminary order by allowing an offending advertisement to be published in the *El Vocero* newspaper after the preliminary order was issued. Finally, the June 22 resolution narrowed the scope of the preliminary order by allowing PR Tele–Com to refer to the DACO study in its print ads, prohibiting only the deceitful or misleading use of the same.

## II.

Plaintiff's primary argument is that DACO's intervention in its advertising campaign violated its rights under the first amendment and constituted an unlawful prior restraint on protected speech activities. Unquestionably, the United States Supreme Court extended first-amendment protection to commercial speech in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).[2] Nevertheless, the Court recognized that the protections afforded commercial speech are not as extensive as those granted to other types of speech. The Supreme Court justified the granting of only limited protection to commercial speech by noting "common sense differences between speech that does no more than propose a commercial transaction, and other varieties." *Id.* 96 S.Ct. at 1830 (quotation omitted). The Court went on to explain that

> Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. The

truth of commercial speech, for example, may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely.

> Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive. They may also make inapplicable the prohibition against prior restraints.

*Virginia Pharmacy Board*, 96 S.Ct. at 1830–31 n. 24 (citations omitted).

In a later case, *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343 (1980), the Court established a four-part mode of analyzing the lawfulness of governmental restrictions on commercial speech. At the outset, a determination must be made as to whether the speech in question is protected by the first amendment. In order for commercial speech to be protected, it must concern lawful activity and not be misleading. Next, a court must ask whether the asserted governmental interest is substantial. Then, the court must determine whether the regulation in question directly advances the governmental interest asserted and whether it is not more extensive than necessary to serve that interest. *Id.* 100 S.Ct. at 2351.

■ Defendants submit that the advertisements in question are not protected by the first amendment due to their allegedly

---

**2.** Prior to *Virginia Pharmacy Board* commercial speech was regarded as unprotected by the first

amendment. *See Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

misleading nature, and thus DACO was free to regulate as it saw fit.[3] Moreover, DACO claims that this court should view with deference DACO's determinations regarding the truthfulness of the PR Tele-Com ads.

■ The level of deference to be afforded to an administrative agency's determination of the deceitfulness of an advertisement is a question to which, frankly, this court has found no easy answer. Traditionally, administrative agencies such as the Federal Trade Commission have been entrusted with determining the "misleading" or "fraudulent" nature of commercial communications. *See, e.g.,* 15 U.S.C. § 45 (F.T.C. can prohibit dissemination of false and misleading advertising without seeking judicial determination that commercial is false); *F.T.C. v. Colgate-Palmolive Co.,* 380 U.S. 374, 392–95, 85 S.Ct. 1035, 1046–48, 13 L.Ed.2d 904 (1965) (same); *Lynch v. Blount,* 330 F.Supp. 689 (S.D.N.Y.1971) (in enforcing mail fraud statutes, Postal Service is competent to distinguish between false commercial representations and true assertions). Because such agencies have developed an expertise in the area of false advertising claims, an agency determination that a certain advertisement is misleading has in the past been subject only to "substantial evidence" or "clearly erroneous" standards of review. *See, e.g., Amer-*

*ican Home Products Corp. v. F.T.C.,* 695 F.2d 681 (3rd Cir.1982); *National Com'n on Egg Nutrition v. F.T.C.,* 570 F.2d 157 (7th Cir.1977) (F.T.C. determination on misleading nature of advertisement subject only to "substantial evidence" review). Thus, defendants are correct to the extent that they can cite a well established pattern of deference by federal courts to agency determinations that a commercial advertisement is misleading.

Nevertheless, it must be noted that this pattern of deference evolved during a period of time when commercial advertising was thought to be completely unworthy of first amendment protection. *See Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Since *Virginia Pharmacy Board,* however, truthful commercial speech has been brought under the first amendment umbrella, and thus a determination of an advertisement's misleading character has become a question of constitutional significance, which usually requires an independent judicial determination. *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). We note that in most other first amendment contexts courts have refused to defer to an agency's determination that a particular statement is unprotected by the first amendment. In *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649

3. Defendants have also argued that this court should abstain from hearing this case under the doctrine of *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). While we find the *Burford* doctrine inapplicable to the facts at hand, we note that a case not cited by defendants comes much closer to hitting the mark. In *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 625, 106 S.Ct. 2718, 2721, 91 L.Ed.2d 512 (1986), the Supreme Court instructed federal courts to dismiss claims to enjoin pending "coercive" administrative proceedings if state court review of the agency determination affords the parties the opportunity to fully and fairly litigate constitutional issues. For *Dayton* abstention to be appropriate, a three part test must be met: (1) there must be an ongoing "coercive" state administrative proceeding; (2) there must be an important state interest involved; and (3) the federal plaintiff must have an adequate opportunity for judicial review of his constitutional claims during or after the proceeding. *University Club v. City of New York,* 842 F.2d 37 (2nd

Cir.1988). While the first two prongs appear to be satisfied in the case at hand, defendants herein have made no effort to convince the court that PR Tele-Com's federal constitutional rights would be protected in local court. To do so, in the context of this case, defendants would have to guarantee that plaintiff herein could obtain state court review well before July 30, 1990, the date of the Equal Access balloting. This is unlikely. Moreover, for reasons to be expressed in the body of this opinion, defendants might also have to demonstrate that the local court would apply a non-deferential standard of administrative review to the question of whether plaintiff's advertisements were protected by the first amendment. *See generally,* Note, *De Novo Judicial Review of Administrative Agency Factual Determinations Implicating Constitutional Rights,* 88 Colum.L.Rev. 1483, 1507–11 (1988). In any event, no argument for abstention under the *Dayton* rationale has been advanced by defendants and *Dayton* is not found to be applicable to the case at hand.

(1965), for instance, the Court held that courts—and not agencies—must ultimately decide if material is obscene and therefore unworthy of first amendment protection. The court noted that "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Id.* at 57–58, 85 S.Ct. at 738. One commentator has opined that in the first amendment context "no procedure is valid which leaves the protected character of speech to the final determination of an administrative agency, no matter how 'judicial' its procedure." Monaghan, *First Amendment "Due Process"*, 83 Harv.L.Rev. 518, 524–25 (1970).[4] *But see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (where the Court deferred to the NLRB's determination that certain union activities were coercive and therefore not protected by the first amendment).

The question, then, becomes whether the policy of an independent analysis of the unprotected character of speech applies to the regulation of commercial advertising. Arguing that it does not, in addition to the alluded to tradition of affording deference to an agency's expertise in matters long entrusted to it, is the limited nature of the constitutional protection granted to commercial speech. Unquestionably, a direct consequence of the limitation of protection for commercial speech has been fewer procedural safeguards than when non-commer-

cial speech is involved.[5] For instance, it seems clear at this point that the strong presumption against the validity of prior restraints does not apply in the commercial speech context. *Virginia Pharmacy Board*, 96 S.Ct. 1817 at 1831 n. 24; *see also F.T.C. v. Colgate–Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965) (F.T.C. may constitutionally order prior cease and desist orders against advertisements deemed to be deceptive). Moreover, in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 2708–09, 53 L.Ed.2d 810 (1977), the Court noted that "the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial area." [6]

Furthermore, in *Virginia Pharmacy Board*, as well as other cases, the Supreme Court explicitly contemplated state regulation of untruthful advertisements:

Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805–806 (1974); *Konigsberg v. State Bar*, 366 U.S. 36, 49, and n. 10, 81 S.Ct. 997, 1005–1006, 6 L.Ed.2d 105, 116 (1961). Obviously, much commercial speech is not probably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of com-

---

**4.** Elsewhere, however, Professor Monaghan has observed that "an affirmative requirement of judicial factfinding grounded on either article III or the first amendment has startling implications. Any such general requirement seems inconsistent with the practical exigencies of the administrative state." Monaghan, *Constitutional Fact Review*, 85 Colum.L.Rev. 229, 258 (1985).

**5.** *See generally* Note, *"New and Improved": Procedural Safeguards for Distinguishing Commercial From NonCommercial Speech*, 88 Colum.L. Rev. 1821 (1988) (discussing lack of procedural safeguards existent in commercial speech determinations and recommending implementation of safeguards similar to those used in determining obscenity).

**6.** In the context of a defamation action, for instance, false or misleading speech is met with

constitutional tolerance insofar as a public figure plaintiff must prove a defendant's knowledge of falsity or reckless disregard for the truth in order to prevail. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Commercial speech does not receive such leeway, and false commercial speech may be stripped of constitutional protection regardless of the speaker's state of mind. *See Bates v. State Bar*, 433 U.S. 350, 383, 97 S.Ct. 2691, 2708, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board*, 425 U.S. at 771–72 & n. 24, 96 S.Ct. at 1830–31 & n. 24; *see also, U.S. Healthcare v. Blue Cross of Gr. Philadelphia*, 898 F.2d 914 (3rd Cir.1990) (holding that "actual malice" standard of liability does not apply to defamatory commercial speech).

mercial information flow cleanly as well as freely.

*Id.* 96 S.Ct. at 1830–31 (footnote omitted).

Arguably, if states are to "deal effectively" with the problem of misleading advertising, they must be allowed a certain amount of deference in determining what is misleading and what is not. *Cf. Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3rd Cir. 1976) ("[w]hether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law").

Nevertheless, in a recent case a plurality of the Supreme Court refused to defer to the Illinois Supreme Court's finding that statements appearing on an attorney's letterhead regarding his "certification" as a civil trial specialist were "misleading." *See Peel v. Attorney Registration and Disciplinary Commission of Ill.,* — U.S. —, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990). Citing *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), a case which held that an appellate court must make its own determinations of "constitutional facts,"[7] the plurality rejected Justice O'Connor's dissenting argument that a state supreme court, due to its inherent power to oversee

its own bar, was in a better position than the Court to determine the deceitfulness of an advertisement. *Id.* The plurality concluded: "[t]hat the judgment below is by a State Supreme Court exercising review over the actions of its State Bar Commission does not insulate it from our review for constitutional infirmity. The commission's authority is necessarily constrained by the First Amendment to the Federal Constitution...." *Id.* Therefore, the plurality found an independent judicial determination of the deceptive nature of the statements was required.

Applying all of the foregoing to the case at hand, this court acknowledges that if commercial speech is to be afforded *any* meaningful constitutional protection, the government cannot simply justify its regulations with a hollow or talismatic determination that an advertisement is "misleading." Wooden deference to a state's determination as to the misleading nature of an advertisement would obviously place in jeopardy some commercial speech that is in fact not misleading and thus deserving of at least limited first amendment protection. We do not, however, think that adopting an independent judgment on the protected nature of commercial advertisements necessarily prevents us from acknowledging the

---

7. In *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), a trade libel case not involving commercial speech or a review of agency findings, the Court broadly held that a federal appellate court must make its own independent determination of the alleged falsity of defendant's published statements about the performance of plaintiff's loudspeakers—and may not merely review the factual findings of the lower court under the "clearly erroneous" standard. *See* Fed.R.Civ.P. 52(a). The Court found that this holding was consistent with a wide body of cases in which the court exercised its independent judgment as to whether the speech in question allegedly fell into one of several categories—*i.e.,* fighting words, obscenity, incitement to riot, and contempt—that have been deemed unworthy of first amendment protections. *See Bose Corp. v. Union of U.S., Inc.,* 104 S.Ct. at 1962–63, and cases cited therein. The Court concluded that it has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within

acceptably narrow limits in an effort to ensure that protected expression will not be inhibited. Providing triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas.

*Id.* 104 S.Ct. at 1962 (footnote omitted). *See generally,* Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229 (1985).

Subsequently, at least one circuit court of appeals has refused to apply *Bose* to commercial speech cases. In *F.T.C. v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35 (D.C.Cir.1985), the District of Columbia Circuit, via Judge Bork, applied the clearly erroneous standard to the district court's finding that a "99% tar free" claim made by a cigarette manufacturer about its product was deceptive. Finding the implications of *Bose* to be unclear, Judge Bork found that it did "not change the standard of review in deceptive advertising cases." *F.T.C. v. Brown & Williamson Tobacco Corp.,* 778 F.2d at 41 n. 3.

view of an agency experienced in dealing with such matters.

■ In any event, the court has no trouble in this case agreeing with DACO that the advertisements in question are at least potentially misleading to the public and that some form of regulation was justified. Beginning with the newspaper ad, which prominently displays the words **"DACO SAYS IT"** over several of P.R. Tele–Com's guarantees that have little or nothing to do with DACO's published report, we note that confusion might exist in some people's minds as to what was or was not included in DACO's report. We think that it was within DACO's power to "require that [this] commercial message appear in such a form ... as [is] necessary to prevent its being deceptive." *Virginia Pharmacy Board*, 96 S.Ct. at 1830 n. 24.

Likewise, we find that statements made in the broadcast media advertisements carry potentially deceptive messages about the contents of DACO's study. The phrase, "According to DACO, the rates lower than AT & T's ... are from Puerto Rico Tele–Com" implies that DACO had

determined only one company—PR Tele–Com—offered lower rates than AT & T, when in fact DACO's study concluded that plaintiff was only one of several companies offering cheaper fares than the communications giant. We think that DACO "retain[ed] the power to correct omissions that have the effect of presenting an inaccurate picture" of its conclusions. *Bates v. State Bar of Arizona,* 97 S.Ct. at 2707.[8] We also note the well established administrative policy that where an advertisement conveys more than one meaning, one of which is false, the advertiser is liable for the misleading variation. *See National Com'n on Egg Nutrition v. F.T.C.,* 570 F.2d at 161 n. 4, and cases cited therein.[9]

■ Even assuming that plaintiff's ads are not so misleading as to make them completely devoid of constitutional protection, we find that DACO's regulations, as applied, afforded plaintiff the limited constitutional protection as delineated in *Central Hudson.* That case, as already mentioned, validates certain types of regulation of commercial speech even where the speech is not so misleading as to remove it entirely from constitutional consideration.[10]

8. Plaintiff contends that it is under no duty to do its competitors' advertising for them—*i.e.,* to publish in its ads that other companies *also* have lower rates than AT & T—and the court respects this view. However, the text of plaintiff's radio and television ads does not merely read "DACO says PR Tele–Com has lower rates than AT & T," which is the truth and no more, but rather "DACO says that *the rates* lower than AT & T ... *are from PR Tele–Com,*" which, we think, carries the additional, untruthful, implication that plaintiff alone offers lower rates than AT & T. (Emphasis added). "It is not difficult to choose statements, designs and devices which will not deceive," *Virginia Pharmacy Board,* 96 S.Ct. at 1831 n. 24, *quoting United States v. 95 Barrels of Vinegar,* 265 U.S. 438, 443, 44 S.Ct. 529, 531, 68 L.Ed. 1094 (1924), and plaintiff by its own choice of wording made its ads potentially misleading.

Nevertheless, we note that some of DACO's alternative justifications for regulating the radio and television advertisements are not supportable even under a deferential standard of review. For instance, DACO's cease and desist orders state that the use of present tense verbs when referring to PR Tele–Com's rates have "the misleading effect ... that [PR Tele–Com] is an established company which presently has some rates." We find this assessment unreasonable in light of the fact that the advertisements in

question are obviously referring to the Equal Access campaign process and the rates that will be offered when the subscribers' balloting is implemented. Similarly, we find one of DACO's objections to the television commercial unjustified. In the cease and desist order, DACO objected to the fact that while a voice overstated "lower rates than AT & T to the Dominican Republic" the words *"lowest* rates to the Dominican Republic" were printed on the screen. (Emphasis added) DACO's claim that the disparity between the oral and written messages is somehow "misleading" or "confusing" to viewers rings hollow given the fact that, according to DACO's own study, both statements are *true.*

9. We note, however, that plaintiff was not alone in making questionable statements about being the only one to offer rates lower than AT & T. At the hearing, the court heard tapes of advertisements of the company Telefónica Larga Distancia, a state-owned corporation, which unqualifiedly declared its rates to be the "lowest", whereas DACO's report concludes that this distinction is shared by Telefónica and plaintiff. Curiously, Telefónica has not been sanctioned by DACO in any way.

10. Whether an advertisement is so "misleading" as to remove it from constitutional protection, and whether government regulation of an argu-

For a regulation to be justified under the *Central Hudson* test, it must directly advance a substantial government interest and be no more extensive than necessary. *Central Hudson*, 100 S.Ct. at 2351.

There is no question that Puerto Rico has a substantial state interest in protecting consumers from false or potentially misleading advertising and that DACO has been adequately empowered by the Puerto Rico legislature to deal with this problem. 3 L.P.R.A. § 341e(j). Nor is there any doubt that DACO's intervention against plaintiffs directly advanced that interest.

With respect to the "no more extensive than necessary" prong of the *Central Hudson* test, a recent case has held that a governmental restriction on commercial speech need not be the absolute least restrictive means to achieve a desired end; rather, there need only be a reasonable "fit" between the government's ends and the means chosen to accomplish those ends. *Bd of Trustees of State Univ. of N.Y. v. Fox*, ─── U.S. ───, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). In light of this holding, the court finds a reasonable "fit" between DACO's orders against plaintiff and its mandate to protect consumers. With regard to the newspaper ad, DACO's final order[11] was narrowly tailored to prohibit plaintiff from using the DACO study in a way that had been determined to be mis- leading. Plaintiff was still able to make appropriate reference to the study and to advertise its rates and services in a variety of ways.

DACO's cease and desist orders against the radio and television commercials are potentially more troublesome due to the fact that they were broader in scope. These orders prohibit plaintiff from making *any* explicit reference to the study, including references that are not misleading. Nevertheless, we find that these also come within the standard set forth in *Fox*. While plaintiff could not make specific reference to the DACO study, it could, consistently with DACO's orders, continue to compare its rates favorably with AT & T's. It could also utilize information contained in the study without citing the study itself. More importantly, at the time plaintiff filed this suit, these orders, like the original cease and desist order against the print advertisement, were meant to be temporary measures subject to subsequent tailoring. We view them as such.[12] While an open ended or final prohibition against *any* use of DACO's study might be constitutionally impermissible, and contrary to DACO's enabling act, we think it was permissible for DACO to temporarily prohibit use of its study pending an administrative hearing on whether the injunction should be extended or modified.[13] The court therefore finds no

---

ably misleading advertisement violates the *Central Hudson* test might be two separate inquiries. In other words, it might in some cases be unnecessary to determine whether the speech is "misleading" in the constitutional sense—and unprotected—if the regulation of that speech nevertheless satisfies the last three prongs of the four-part *Central Hudson* test.

**11.** DACO's final order of June 22, 1990 narrowed the scope of its preliminary cease and desist order against the newspaper advertisements.

**12.** At the time plaintiff filed this suit, the preliminary cease and desist orders were to have a life span of ten days from the time they were issued. Prior to the hearing before this court, one such order—against the newspaper ads—had already been narrowed following an administrative hearing. The administrative hearings on the other two orders have not taken place, however, apparently as the direct result of the filing of this action. Plaintiff has not claimed that it requested the hearings to be held as scheduled and was denied. (To the contrary, we note that plaintiff tried to cancel its hearing before DACO concerning the newspaper ads, citing to the pendency of its federal suit. *See* Plaintiff's Exhibit No. 1). We do not think that plaintiff should be entitled to interrupt the local administrative process by filing a federal suit and then turn around and claim a legal benefit from the fact that the local process was stalled and that, consequently, the "temporary" measures in effect became permanent. Therefore, we view the cease and desist orders as what they were when plaintiff filed its initial request for a temporary restraining order.

**13.** We nonetheless express our concern that DACO chose to bar any mention of its study by plaintiff. Obviously, such a ban, directed at the entire long-distance industry, would serve to suppress not only misleading uses of DACO's study, but constitutionally protected truthful presentations as well. "States may not place an absolute prohibition on certain types of poten-

violation of plaintiff's first amendment rights.

■ The complaint also makes allegations of a due process violation. We have examined the pertinent facts and find no showing that any lapse in the process afforded plaintiff rises to the level of a constitutional violation. Finally, pursuant to the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), we decline to exercise jurisdiction over the state law claims.

The request for injunctive relief is now DENIED.

IT IS SO ORDERED.

tially misleading information ... if the information also may be presented in a way that is not deceptive." *In Re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). DACO has proffered no substantial state interest in having its studies entirely excluded from the realm of commercial advertising, nor could it do so given the fact that DACO's own enabling act relegates the results of DACO's studies and investigations to the public domain. *See* 3 L.P.R.A. § 341m(d). We need not pursue this matter, however, for two reasons: first, DACO has not in fact ordered blanket ban of use of its studies, but has merely prohibited one company, via a temporary cease and desist order, from referencing the study in its ads. Second, even if DACO had issued an industry-wide ban, the plaintiff in this case would not have standing to raise the issue, as the "overbreadth doctrine,"—which holds that a party may object to the facial unconstitutionality of a statute as applied to third parties even if the statute may constitutionally be applied to the facts of his case—does not apply in the commercial speech context. *See Fox*, 109 S.Ct. at 3035–38; *Bates v. State Bar*, 97 S.Ct. at 2707–08.